### J. C. LOMAX V. THE STATE.

No. 20745. Delivered February 28, 1940 .
Rehearing Denied November 13, 1940.
Application for Leave to File Second Motion for Rehearing
Denied November 27, 1940.
Appealed to United States Supreme Court.
Order of United States Supreme Court Granting Certiorari
Filed March 10, 1941.
Mandate of Supreme Court of United States Reversing
Judgment of Court of Criminal Appeals Filed
June 10, 1941.
Order of Court of Criminal Appeals Remanding Case
to Trial Court in Accordance with the Mandate
of the Supreme Court of United States Filed
June 18, 1941.

The opinion states the case.

J. G. Davis and Dewey Walker, both of Huntsville, and Chas. M. Burdeaux, of Galena Park, for appellant.

Lloyd W. Davidson, State's Attorney, of Austin, for the State.

GRAVES, Judge.
The offense is rape; the punishment assessed at death.

This is the second appeal in this case; the opinion delivered by the court on the former appeal may be found reported in 136 Texas Crim. Rep. 108, 124 S. W. (2d) 126.

It appears from the record that appellant made a motion in the district court of Montgomery County (being the county in which the alleged offense was committed and the indictment returned by the grand jury) to quash the indictment on the grounds of race discrimination. It seems that the court heard evidence in support thereof and upon its conclusion overruled the motion. This motion, or one of similar import, was again urged after the venue of the case had been changed to Walker County, but no evidence, if any was offered, is brought forward in the record; hence we are not in a position to review the action of the trial court on the subject.

The sufficiency of the evidence is vigorously questioned, and we set forth the whole of the prosecutrix's testimony relative to the transaction:

"I hadn't been asleep long when there was a negro waked me standing over me with a piece of pipe in his hand threatening me and he had the cover pulled off me. He threatened me by having a piece of pipe in his hand drawn on me and he called me and woke me up and said if I hollered he would kill me. The negro asked me where my husband was and then he told me not to lie to him and I was afraid to lie to him and he asked

me where my husband was and I told him because I was afraid
that he was somebody that knew my husband and I told him
where he was. He wanted to know where the children was and
I told him where they were and then he asked me what my
husband done and where he worked and what time he come
in and all of those questions and just asked me a whole lot of
questions. He had the pipe at that time. He told me what he
was there for and asked me if I was willing or not. Of course,
I had to give up. I knew he had me trapped. I had to give up
and told him 'yes' to save my life. He had the pipe in his hand
at that time and he was up over me with it and he had an
old quilt over his head and he didn't have on any clothes more
than a summer knit undershirt. I could only see from his
waist down and his arm because he had an old quilt wrapped
about him. He had no trousers on. One arm was holding the
quilt and he had the quilt over his head and around his body
and one arm through the hole in the quilt. The quilt was just
an old rag that I had thrown away and it wasn't any good. He
threatened me and told me not to lie to him and I was scared
to move or anything because I knew he had the ups on me;
there wasn't anything I could do about it. That was the rea-
son I submitted to him. Yes, sir, this negro's male organ pene-
trated my female organ. Yes, sir, it was against my will to
submit to him. I had not seen this negro before that ravished
me to my knowledge. I didn't know whether I knew him or
not. This occurred in Montgomery County, Texas. After he
started having sexual intercourse with me he laid the iron pipe
on the bed beside him where he could get a hold of it. When he
started to leave he wanted to know if he could come back and
I was scared to tell him he couldn't because I was afraid he
would murder me so I told him 'yes,' so he asked me when and
I told him at any time except Sunday because I knew in rea-
son he already knew my husband and knew where he worked
and I was scared to lie to him so he asked me what time it
was and how long he could stay and I told him he couldn't stay
because it was about time for my husband and I wanted to
get rid of him and he said its not more than nine o'clock—
after he asked me when my husband would come in and I
told him anywhere from twelve o'clock on then he said it isn't
more than nine o'clock and I said 'oh, my Lord yes, it was a
lot later than that when I laid down' and then I told him where
the clock was and when he seen what time it was he broke
and ran and when he ran out of the tent the first thing I
thought of was shooting him and the gun was in the kitchen

and I ran to the kitchen to get the gun and it was unloaded and I had to climb up on top of the safe to get shells to load it with and by the time I got the shells he was too far in the woods and I ran to Mrs. Casey's for help. That is my nearest neighbor. I went to Mrs. Casey's just as quick as I could get the gun after he assaulted me and seen he was gone. Then I ran right up there. I was there in just a few minutes. There wasn't anyone I could see then at Mrs. Casey's but Billy Clark and her two children. Mrs. Casey lived about a 100 or 200 yards from my home. When I ran in Billy Clark was setting in the door where I went in and Mrs. Casey was standing at the cook-stove and I told them what happened and asked if they would go and get Mr. Hudson. Mrs. Casey and Bill Clark were the first persons I saw after the negro had assaulted me and I told them at that time what had occurred. All during the time I saw the negro he kept the quilt wrapped about him. I never did see his face at all. I saw the negro as I ran to the kitchen after the gun and he ran across the road in front of the house and when I went to get the shells from over the safe I glanced through the crack and saw him go over the fence in front of the house. He still had this quilt wrapped about him and hadn't on any clothes that I could see. I don't know where he had pulled off his clothes. I first knew the negro was in the tent when he threatened me and woke me up. The negro that ravished me weighed about 150 or 160 pounds. That is just an estimation; I don't know. The defendant J. C. Lomax compares in height with that negro that ravished me and he was what I would call a medium black negro, the best I could tell in the tent as it was dark. I did not recognize the quilt that the negro had around him at that time."

On cross-examination she testified to substantially the same facts. We quote from her testimony as follows:

"The first thing this person said to me was he told me not to scream or holler; that he would kill me. * * I didn't have anything to defend myself with. * * He asked me was I going to be with him or not; was I going to let him have it or not; he said 'are you going to let me have it or not' and what could I say but 'yes.' * * I was afraid to lie to him because I was afraid for my life.* * When he asked me would I be willing I told him I would because I knew I had to give up. * * His right hand was free at the time of the act, yes, sir. * * I told him he couldn't stay and he wanted to know why and I told him my husband would be in before many minutes or I would have let

him stayed. I knew that if I would let him stay my husband could probably do something with him but I wanted to get rid of him because I wasn't certain when my husband would get in. * * He asked me could he come back to see me before he got off of me; that was during the act. I told him he could because I was scared not to tell him he couldn't. I was afraid I would contrary him and he would murder me. I told him he could come back any day except Sunday. * * I couldn't swear that this defendant is the one I saw in my house. I had not seen that negro before that I knew of and as far as I know I have not seen him since. I couldn't swear that this defendant is the person that was in my house that day and attacked me."

The appellant's confession was introduced in evidence, in part, as follows:

"I am 20 years old. I was 20 years old the 23rd day of last July. I live at New Caney, Texas, with my mother and step-father. I have been living there about four or five months. I have been working at the saw mill there, for Mrs. Prince. On Wednesday of this week, the 30th day of March, sometimes in the morning I went with Mr. Roy, I don't know his other name, out in the woods after a load of logs. I got with Mr. Roy at Mrs. Prince's saw mill, and we went on down by the depot and on down by the negro school house and from there on across Peach Creek after the load of logs. Before crossing Peach Creek we passed by a tent house. In going, this tent house was to our right, about twenty *foor* from the road we traveled in. As we were passing this tent house I asked Mr. Roy if those fellows was still cutting logs. When I asked him this we had passed and was *stoped* down there cross Peach Creek bridge. When I asked about those fellows cutting logs I meant the man that was living in this tent house, I didn't know his name. I did know that he had been working for Mrs. Prince cutting logs. I went on over with Mr. Roy, where he waited for his log buncher to come. I sit there with him for awhile until I heard a truck coming. I told Mr. Roy that I was going back to Caney, then I got out there and flagged the truck down. Then Mr. Roy said, 'no you ain't going.' The truck stopped and there were two white men in the truck which was loaded with ties. They let me get on the truck on top of the ties and ride on up to Caney. They let me off right on the railroad track near the depot. I got off the truck and went to my mama's house and eat. I eat sirrup and bread. There was no one at home. I don't know exactly what time it was around ten or ten thirty when

I eat at home. I went on down to the East of the saw mill, and passed between Mr. Chamber's house and the saw mill, and then on down to the negro hall. There I crossed a bob wire fence between the negro hall and Mr. Rheinhardt and then went on through the field and crossed a bob wire fence again and then on into the woods. I went on down a trail beside of the fence about three hundred yards. I got over the wire fence and crossed over the same road that I had traveled that morning with Mr. Roy first and then with the two white men with the load of ties. I crossed this road right in front of this tent house and went on up to the tent house. I didn't see anyone around there, then I peeped in the tent, and there was a white lady there in the bed asleep. I then walked around to the back of the tent; I seen some children playing up at a neighbor's house. While I was around there a little dog barked. He was black and looked to be a puppy. I went back around in front of the tent, I meant to say the side of the tent close to the Magnolia tree, and got a quilt that was laying there on the ground. Then I got a piece of iron pipe. I see that piece of pipe there and it is the piece of pipe that I picked up out in the yard. I then took off my hat and put it in my pocket and put the quilt over my head and pulled off my pants and shoes and put them under the corner of the tent. I then went on in the house. I entered the tent at the door next to the road and in going in the house I didn't keep up any noise. When I entered the house I had the quilt over my head and part of my body. I could see through a hole in the quilt. I also had the pipe in my hand. When I went in I saw a trunk to my right and a dresser to my left or that is what I took it to be. I don't know for sure if it was a dresser. The bed that this lady was in was up in the corner of the tent nearest to the kitchen. The kitchen is separate from the tent house. When I got in there she was still asleep. I walked on up to the bed and was still covered up with this quilt and still had this iron pipe in my hand. I touched the lady on the hip with my other hand. She woke up after I touched her, and I told her not to run nor holler. Then I asked, 'How about some?' and I then said 'are you going to or not,' and she said, 'yes.' When I got in the bed with her I put the pipe down beside of me. She was in about the middle of the bed, and was laying straight up and down in the bed. She had her clothes on, but her shoes were off, and she was covered up, that is the cover come up to about her breast. She moved the cover back, and then I got on top of her and then I put my peter in her pussy and stayed on her until I got through. While I was on her I asked her where her husband

was at. She told me he was cutting logs for Mrs. Prince. Then I asked her if I could stay any longer. She told me no that her husband would be in at twelve o'clock. I told her that I didn't think that it was more than about nine o'clock. She told me that it was five minutes till twelve then. I then asked her when I could come back to see her. She told me that I could come back any time except Sunday, that her husband would be there then.

"When I was leaving I told her not to tell anyone. I still had the quilt over me when I left. I left the iron pipe on the bed. When I went in the house I had on an undershirt and this polo shirt, which has no sleeves.

"I went back out at the same door that I entered and after I got on the outside I got my clothes from under the corner of the tent, where I left them, and then I run across the road and then in the woods. After I crossed the fence I slipped in some mud. After I got out in the woods from the house I threw the quilt down and then put my clothes on, and went on to the saw mill. Just before I got to the saw mill I heard the twelve o'clock whistle blow. When I got to the saw mill I saw Van Wiley and Poor Boy Wiley. I stayed there until Mr. Jesse Johnson came there. He said a colored man had raped a white woman and asked me where I had been. He said that he could give account of all of them that was working there except me for I wasn't there. I said it wasn't me for I had went to the woods with Mr. Roy on the truck."

Roy Butters testified that on the day of the alleged offense, about 9 o'clock in the morning, the appellant was with him in a truck, and they passed the tent house where Mrs. Stanford, the complaining witness, lived, and appellant asked him who lived in that tent house, and he told him Butters' log cutter (Stanford), and soon thereafter appellant got off Butters' truck and went back to town, such road back to town leading by the Sanford home, about a mile from town.

Billy Clark lived at Mrs. Casey's about 400 yards from Mrs. Stanford's home. He testified that she came to his home excited and hysterical, in her stocking feet, and told him that she had been attacked by one whom she thought was a negro; she told him to get the officers. He got the constable and went to the Stanford home about thirty minutes after she came to his house, and they found the bed messed up, and an iron pipe

lying on the bed. They later found an old quilt lying about a hundred yards from the house. They also found some footprints, and some shotgun shells, and at the time Mrs. Stanford came to the Casey house she had a double-barreled shotgun, unloaded and unbreached. The footprints led out from the house and were plain, and they were followed for about one hundred yards into the woods, and they also found a handprint on the ground there, it looking like some one had fallen down. We quote a portion of Mrs. O. B. Casey's testimony:

"I lived near the Stanford home on March 30, 1938, out back of it. On the morning of March 30, 1938, I saw her about 12:05 when she came to my back door and called me and she saw Billy Clark in the room and she went to talk to him and told him that a negro had attacked her with a quilt wrapped around his head. She just had on a print dress and was in her sock feet and a shot gun that was unbreached. She seemed to be scared. Billy Clark went after Mr. Hutcheson, the constable. She stayed at the house until Mr. Hutcheson and Clark got back, with me. She took a douche while she was there and we then went back to her home. We found two shotgun shells between my home and the Stanford home that she had tried to put in the gun."

Mr. Hutcheson, the constable, testified that a few minutes after 12 o'clock of the day of this alleged assault he went to the negro quarters, and then to Mrs. Stanford's home, and there found a piece of iron pipe lying on the bed, and that he found some tracks and followed them and found where the tracks had slipped in the muck, and the person making same had fallen on one knee, and about twenty-five yards from where he last saw the tracks he found the old quilt offered in evidence.

Mr. W. H. Brady, foreman at the sawmill where appellant was employed, testified that on the day of the alleged offense about 6:15 the appellant came to the mill, and at such time and prior to such time the officers and neighbors had been using dogs—presumptively blood hounds—in this matter; that when he saw appellant he was up on top of the boiler, about seven feet from the ground. Upon being accosted and asked what he was doing up there, appellant said he didn't want the dogs messing with him; upon being told to get down off that boiler and fire it up, he did so.

The quilt that was found along the footprints and identified by Mrs. Stanford as the one belonging to her, and that had been used for the dogs to sleep on, was introduced in evidence and showed to have holes in it, and the appellant was shown to have some hair in his head, identified by a witness as dog hair.

Mr. Johnson, whose wife was the owner of the mill where appellant worked, testified that during the night, while the dogs were running, he saw the appellant lying down on the edger table; appellant said he had been listening to the dogs; he didn't like them; he was scared of them; that he had no confidence in them; they might trail him up, at which time appellant had an open knife in his hand. The witness asked appellant "what he was doing with that knife and he said he was scared of those dogs; he didn't have any confidence in them and they might come up and trail him."

All standards of life are not the same; some people act from one impulse, some from another. Evidently Mrs. Stanford was not expecting appellant's visit, nor was same prearranged. She did not know appellant, nor did he know her. He had, however, inquired who lived in this tent house, and ascertained the fact that Mrs. Stanford's husband was a log cutter, and doubtless reasoned therefrom that he was cutting logs in the woods. Soon thereafter he abandoned his intended journey and came back in the general direction of her home. He prepared himself for a rape by force and threats by taking off his clothing, covering his head with this old quilt, and possessing himself of an iron pipe about 36 inches long. Mrs. Stanford was asleep, sick in bed, a victim of pellagra, and as he approached her he awakened her in a threatening attitude, and with an express threat to take her life if she screamed or hollered.

Faced with such a momentous decision, it lies not in this court's judgment to say that she should have pitted her puny strength against his, armed as he was with such a weapon, and thus given up her life to protect her honor from what her judgment told her was the ravishment of her living body. Instead she took what probably seemed to her to be the only method of saving her life.

Upon the accomplishment of her ravisher's purpose, her conversation only evidenced the carrying out of her purpose of the preservation of her life. Immediately upon being relieved

of his threats, she ran in her stocking feet to her neighbor's home about four hundred yards away and gave the alarm, carrying with her a useless shotgun. That this act was done without her consent is plain to our reasoning. Why, if she had consented thereto, did she run to the neighbor's and give the alarm? Why take a shotgun with her? Why say anything at all if she had consented thereto? Why not hide her indiscretion rather than immediately inform on her ravisher?

Again, if appellant thought his act was consented to by Mrs. Stanford, why the disguise? Why the running away from the tent house? Why the presence of the iron pipe in his hand, and left on the bed?

Rape can be committed on a woman by either force, threats or fraud. See Art. 1183, P. C. "The threat must be such as might reasonably create a just fear of death or great bodily harm, in view of the relative condition of the parties as to health, strength and other circumstances of the case." Art. 1185, P. C. Under the rule as laid down by the above quoted article we think that the threat, accompanied as it was by the exhibition of such a lethal weapon, would be sufficient to measure up to the above statutory requirements. We think the testimony is sufficient to sustain this verdict.

Bills of exception Nos. 1, 2, 3, 4 and 5 have been examined by us and without further discussion are overruled, there being no error evidenced therein.

Bill of exceptions No. 6 is based on the testimony of Mr. Holliday, a Texas Ranger, who testified, in substance, that he saw the quilt that was introduced in evidence; that it had dog hair on it, and there was some dog hair also on the appellant's head; that he had seen and owned dogs all his lifetime, and there were two dogs around the (Stanford) place, and these hairs on the quilt and in appellant's head were dog hairs. The main objection thereto was that the witness had not qualified as an expert. We think the objection went more to the weight rather than to the admissibility of the testimony.

Appellant's bill of exceptions No. 7 claims a misconduct on the part of the jury in that it is alleged that they were allowed to separate during the trial of the case. It appears from the testimony that during the trial of the case, and while the court was in recess, the jury was taken to a barbershop where

some of them were shaved by a barber. It also seems that all the jury were kept together; however some of them were standing inside the shop and some around the open door just outside but all in a rather compact group, and in sight of each other, and in sight and hearing of the officer in charge of the jury. It also appears that at one time an outsider, Mr. Randolph, passing the barbershop, spoke to one of the jurors and asked him if that was the jury, and if they still had the case. This outsider said that the juror merely said "yes"; however it is denied by the juror that he said anything at all. The officer says that the jurors were together, and not more than ten or twelve feet from each other and the ones in the barber chairs at any time, nor did the officer see anyone of the jurors reading a paper, nor hear them nor see them talking to any outsider. When the juror was spoken to by Mr. Randolph he merely answered by shaking his head. The barber testified that there was no conversation between a juror and any outsider. Others testified that they saw the attempted conversation between Mr. Randolph and the juror, and the officer stopped Mr. Randolph before any answer was given. Another barber present part of the time the juror was being shaved said there was no conversation with any of the jurors while he was in there by anyone.

The trial court heard the evidence and evidently found that there was no basis for the allegation of such misconduct on the part of the jury, and we think his judgment thereon should not be disturbed.

Appellant complains, in his objections to the court's charge, because of the fact that the indictment charged the rape herein to have been committed by force, threats and fraud, that it was incumbent upon the part of the trial court that all three methods of thus committing this crime should have been charged conjunctively and thus proven. We do not thus interpret the law. There are three methods of committing a rape on a female, either by force, or by threats, or by fraud, and in this instance the trial court gave a separate charge on force, and a separate one on threats, using the statutory definition thereof. We think such a charge correctly presented the law thereon. A rape can be committed by both force and threats combined. See Sharp v. State, 15 Texas Crim. App. 171.

Appellant further objects to said charge of the court because of the fact that in such charge the trial court uses the

term "violently ravish" and have carnal knowledge of Mrs. Gertrude Stanford, etc. Such a term was doubtless used by the court in an excess of caution, and was probably giving the appellant more rights than he was entitled to, and we can see no injury to his rights because of such charge. Violent means with force and strength, and since, as held in the Sharp case, supra, a rape can be committed by both force and threats, such a phrase, though possibly unusual, would place a greater burden upon the State than was necessary, especially under the facts of this case, and such would not operate as an injury to this appellant.

The court's charge we think was fair and full relative to the voluntary character of the confession of the appellant, and we overrule all objections to such portion of said charge.

While Mrs. Stanford did not resist this attack to the death, yet taking into consideration the fact that she was a victim of pellagra, and was of a strata in life that called a tent house in the piney woods her home, it lies not in this court to say that she consented to this act of intercourse with a strange negro, who at least prepared himself to commit a rape upon a defenseless woman. Taking under consideration all the surrounding circumstances of this case, we are impressed with the idea that this unfortunate lady was the victim of the unbridled lust of this man, and probably pursued the only course left open to her to preserve her life.

This case was carefully tried, and appointed counsel seem to have zealously preserved all the rights of appellant in this trial. We have carefully considered all the bills of exception presented, and we find no error therein.

The judgment is affirmed.

ON MOTION FOR REHEARING.

HAWKINS, Presiding Judge.

In his motion for rehearing appellant stresses only two points. As one ground for said motion he urges that the district attorney in his argument made indirect reference to his failure to testify in contravention of Art. 710 C. C. P. It appears from the record that no objection was interposed to such argument at the time it was made and the question is not brought forward by bill of exception. The first time the matter was ever complained of was in the verified motion for a new

trial in which the language claimed to have been used by the district attorney is set out. Appellant cites us to Anderson v. State, 85 Tex. Cr. R. 422, 214 S. W. 353 as authority supporting the proposition that the question can be preserved in the manner here shown. We doubt if the case mentioned goes as far as appellant claims. It appears from the opinion that some things objected to in the argument were complained of in bills; others were set up in the motion for new trial. The opinion points out a number of other errors which occurred on the trial. The court said the judgment ought not to be affirmed "in view of this record." It is doubtful if the court would have predicated a reversal alone upon the complaint of argument. We say in view of the fact that the same court four years earlier had the exact question before it in Johnson v. State, 171 S. W. 1128, and in a majority opinion held directly that a complaint of argument such as here claimed would not be available unless objection was interposed at the time the argument was made and the court's ruling thereon be brought forward by bill of exception. Since the cases mentioned were decided this court on numerous occasions has had occasion to pass upon the same subject. The general rule is stated in 4 Tex. Jur., Sec. 41 as follows:

"Orderly procedure demands that a complaint that counsel in his argument to the jury has transcended legitimate bounds should be addressed to the trial judge, so that he may determine its propriety and counteract any injustice that may protend, and that the offending counsel himself may be accorded opportunity to withdraw any objectionable remarks. It follows that unless a timely and proper objection is made a defendant on appeal will not ordinarily be heard to complain. He is tardy if he does not object until the conclusion of the argument, until he makes a motion for a new trial, or until he prepares a bill of exception after the trial." Application of the rule will be found in the following cases, some of which are cited in support of the text quoted. Harris v. State, 93 Tex. Cr. R. 544, 249 S. W. 485; Simmons v. State, 93 Tex. Cr. R. 421, 248 S. W. 392; Salinas v. State, 113 Tex. Cr. R. 142, 18 S. W. (2d) 663; Thompson v. State, 116 Tex. Cr. R. 437, 34 S. W. (2d) 250; Crowley v. State, 117 Tex. Cr. R. 372, 35 S. W. (2d) 437; Ross v. State, 102 Tex. Cr. R. 364, 277 S. W. 667; Scott v. 132 Tex. Cr. R. 517, 105 S. W. (2d) 242. An examination of the authorities referred to will reveal that some of them deal with the exact question here presented, and are adverse to appellant's contention.

As the other ground upon which the motion for rehearing is predicated appellant urges that his bill of exception number two presents error. The bill in question reserved exception to the admission in evidence of appellant's confession for the reason as stated in the bill that "same was not free and voluntary, and was made under duress, and not in compliance with the statute." We are referred in the bill to certain pages of the statement of facts. Upon examination it is found that they relate entirely to the testimony given by the district attorney who took appellant's confession. There is nothing in his evidence which would even suggest that the confession was other than voluntary, and made in compliance with the statute. (Art. 727 C. C. P. 1925). After laying the proper predicate by the district attorney's evidence the State offered in evidence the confession. No request was made that the court defer his ruling until appellant might develop the matter further, and there is no question but that the trial court ruled correctly at the time the confession was offered in evidence. Later during the trial the State called as a witness C. B. Wagers, a deputy sheriff of Montgomery County, Texas, who testified that Ranger Holliday, Ranger Williamson, Captain Purvis and other officers worked with witness on the case. The witness detailed the various investigations made by the officers in regard to the alibi claim of appellant. Upon cross-examination and further re-direct examination Mr. Wagers testified as follows:

" * * * We arrested the defendant the night of the first of April and we locked him up and I didn't see him any more until sometime the next morning around ten o'clock. Mr. Hurse was with me when we took him to jail. We carried him from New Caney to Conroe and put him in jail. Mr. Holliday was in New Caney when the defendant was arrested but he went to Livingston and we went to Conroe and we didn't talk to the negro any more until the next morning. Mr. Holliday and Mr. Williamson and Mr. Purvis came to Conroe. The next morning when I saw him there was Mr. Holliday, Purvis, Williamson, Hurse and myself present. We took turns questioning him. We weren't trying to high-pressure him but were just trying to find out what he was and where he had been and checking up on his alibi. We checked up on his alibi in New Caney. I did not curse this defendant. I am sure of that. I don't know of anybody else that did. I did not threaten or strike this defendant in order to get him to make the confession. I didn't burn him with any cigarettes. If anybody had a blackjack at the time we were questioning him I didn't see

it. I might have had one. I generally carry one. We questioned the defendant in the grand jury room. We brought him down from the jail to the grand jury room. The grand jury room is on the third floor of the courthouse. We took the defendant's clothes off him. He was not handcuffed. He was standing up. We brought him down from the jail and looked at his clothes and missed the undershirt that he had on when he was arrested and we stripped him off and made him stand up for a few minutes until I went back up in the jail. He stood up probably five or ten minutes; just long enough for me to go catch the elevator and go up to the fifth floor and we looked back in the bedding in the cell and found the undershirt. We kept him standing ten minutes at the longest without his clothes on. He was still standing when I got back. We did not have nor put an electric light bulb in front of the defendant's eyes. All of the lights were ceiling lights. We did not promise the defendant that if he would make a confession he could cop off a few years in the penitentiary. I never heard anyone promise the defendant anything in order to get him to make a confession. We kept the defendant in the grand jury room that morning between fifteen and thirty minutes. I wouldn't be positive whether the defendant was standing all of that time or not. I was standing during the time I was in there. After we finished with the defendant we took him back to jail and I went back to New Caney with the rest of them. The defendant did not confess to the crime during the time we questioned him about ten o'clock. I next saw the defendant that night about eight o'clock. I don't know whether he was kept awake or not. We did not take his clothes off of him when we next saw him at 8 o'clock in the grand jury room. Holliday, Williamson, Hurse and myself were present at the time. After we talked to the defendant thirty or forty minutes I left and went and got some coffee and we came back to the office and put in a phone call and sat there in the office and talked awhile and then we went back up to the grand jury room. Williamson and Hurse were still in the grand jury room. The defendant was not handcuffed at that time. The defendant had his clothes on and was standing up. When I came back in Holliday and myself went in the washroom and when I came back I sat down right at the door and Mr. Holliday was standing up talking to the negro and the negro was standing up talking to him and he talked to him five or ten minutes and thats when the negro admitted to him that he committed this crime. None of us threatened this boy and did not curse him nor did we make any promises. No proposition was made to him in any

way. I was not with the defendant all of the time. We had the defendant in the grand jury room then from about eight o'clock until between 11 and 12. Around, I would say, a quarter of twelve. Mr. Davenport was not there with us. We did not burn an electric light bulb directy in the defendant's eyes and make him look at it. * * * I saw the defendant on March 30, 1938, and arrested him and put him in jail and didn't see him any more until April 1st at about ten o'clock and myself and four other officers talked to him then about thirty minutes and that night we brought him again to the grand jury room and grilled him from 8 o'clock until 12. I wouldn't know whether the defendant was required to stand because for about two hours I wasn't there. He was standing when I left about 8 or 9 o'clock. The defendant was examined by all of us officers at different times. To a certain extent we were continuously firing questions at him. During the time of all the questioning there was nothing done to this negro except just talk to him. That is my testimony. No pressure whatever was brought to bear on him. * * * When I went back up in the jail the first time and the defendant's clothes were off I went up to look for his undershirt which he had taken off. That (indicating) which you hand me are the pieces of the old undershirt which I found when I went back into the jail in the cell in which he was placed. He had on an undershirt at the time he was arrested and the time he was placed in jail. At the time he was questioned in the grand jury room by myself and the other officers he had on no undershirt."

The State then called as a witness R. D. Holliday, a State Ranger. Upon the issue of the confession he testified as follows: " * * * I was present when he was questioned and more or less took the lead in questioning him. I wasn't present one time when he was questioned. I went and got some coffee and was gone about thirty minutes. I was present when the defendand first admitted he committed the offense. I was questioning him when he admitted he committed the offense. I was present at the time the statement was given in your office and signed. I was the one that called you to come down to your office and take the statement. * * * At the time the defendant was questioned in the grand jury room there were no guns or any blackjacks displayed by any of us that were present. There was no light held up in the defendant's face. Nobody in my presence burned the defendant with a cigarette. None of us cursed the defendant. None of us promised the defendant anything to induce him to sign the statement. I witnessed the confession that

has been introduced in evidence. I will say this, that this negro was treated as good as any prisoner could be treated and talked to in a manner which nobody could take exception to and we didn't threaten him in no way and he made the statement just as voluntarily as I am sitting in the stand. * * * None of the officers which questioned the defendant, including myself, abused the defendant in any way. None uf us struck him or attempted to strike him or threaten to strike him. We did not threaten the defendant in any way during the time we were questioning him. He was not threatened at any time he made the statement in your office and it was reduced to writing and signed by the defendant. You did not promise nor did anyone else promise the defendant anything to induce him to sign this statement."

The other officers present when appellant was being questioned were not called by appellant. He did not testify himself, and made no claim that the confession was untrue, or that he was forced to give same under duress, fear or promises.

In the motion for rehearing some stress is laid on the point that appellant was caused at one time to remove his clothing. Prosecutrix testified that the negro who attacked her had an old quilt over his head and had on no other clothes save "a summer knit undershirt." At the time appellant was arrested and placed in jail he was wearing an undershirt, suiting that description, but when the officers were questioning him it was discovered he did not have on said undershirt. It was at this time he was caused to remove his clothes until search was made for the undershirt with the result stated by witness Wagers in his evidence.

Appellant cites the case of Chambers v. State of Florida, 60 S. Ct. 472, 84 L. Ed. 716, as supporting his contention that we should hold as a matter of law that the confession of appellant was not voluntary. We are conversant with the opinion mentioned, also with that of the Supreme Court of the United States in White v. State, of Texas, 310 U. S. 530, 84 L. Ed. 1342, decided May 27, 1940. The principle announced in those cases has been given effect in Blackshear v. State, 130 Tex. Cr. R. 557, 95 S. W. (2d) 960; Abston v. State, 132 Tex. Cr. R. 130, 102 S. W. (2d) 428; Abston v. State, 136 Tex. Cr. R. 152, 123 S. W. (2d) 902; Sigler v. State, 139 S. W. (2d) 277, not yet reported in State reports. (139 Texas Crim. Reports 167). Some of the Texas cases mentioned were decided long

before the opinion in the Chambers or White cases (supra) were delivered. Under the facts here presented we think appellant's contention that we should say as a matter of law that the confession should not be considered is untenable.

The motion for rehearing is overruled.

ON APPELLANT'S APPLICATION FOR LEAVE TO FILE
SECOND MOTION FOR REHEARING.

CHRISTIAN, Judge.

The motion but reiterates a contention made in appellant's motion for rehearing. Such contention was squarely met in the opinion on motion for rehearing, and we are of opinion that the conclusion there stated is correct.

The application for leave to file second motion for rehearing is denied.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

ORDER.

HAWKINS, Presiding Judge of Court of Criminal Appeals of Texas.

The judgment of conviction was affirmed on February 28, 1940. Motion for rehearing was overruled on November 13 ,1940. Appellant made application to the Supreme Court of the United States for writ of certiorari to review the action of this court. The writ was granted and on May 5, 1941, the Supreme Court of the United States reversed the judgment of this court and remanded said cause for further proceedings not inconsistent with the order of said Supreme Court of the United States.

Therefore, in compliance with said order this cause is re-manded to the trial court for further proceeding therein as may be consistent with the order and opinion of the Supreme Court of the United States.

Accompanying this order, and made a part thereof, is a certified copy of the mandate from the Supreme Court of the United States now on file as a part of the record in this cause.

This, the 18th day of June, 1941.