165 So.2d 918

Robert Lee DAVIS

v.

STATE.

1 Div. 937.

Court of Appeals of Alabama.

April 7, 1964.

Rehearing Denied April 28, 1964.

Thos. M. Haas, Mobile, for appellant.

Richmond M. Flowers, Atty. Gen., and Owen Bridges, Asst. Atty. Gen., for the State.

CATES, Judge.

First degree burglary (intent to ravish): ten years sentence—minimum. The appellant is a Negro; the prosecutrix is not.

The prosecutrix testified that (at the time here pertinent) she was spending the night alone at home:

"A   Well, around 3:00 or 4:00 o'clock I woke up with a colored man in bed with me.

"Q   What caused you to awake?

"A   Because he was kissing me.

"Q   What did you do?

"A   I began talking to him and asked him who he was, and he said, 'Joe,' and I said, 'Who is Joe?' And he said, 'You know Joe.'

"Q   What else, if anything, was said?

"A   I said: 'Let's get up and I will make some coffee.' And he said that he didn't want any coffee, and I said: 'Turn the light on,' and he said, 'I don't want you to see my face.'

\*   \*   \*   \*   \*   \*

"Q   During that period of time how close did this individual who was there get to you?

\*   \*   \*   \*   \*   \*

"A   Well, you know, I could feel on my legs—I had on my shortie pajamas and my step-ins and all, and he didn't get them off, and that is all the close he come."

About a month later, July 24, 1962, she got a phone call. Her evidence continues:

"He called, and he said, 'You don't know who you are talking to?' And I said, 'No, I don't.' He said, 'Don't you remember me coming to your house?' and I said, 'No, I don't.' He said, 'Don't you remember me coming to your house in June?' I said, 'No, I don't.' I said, 'Who was with you?' He said, 'I was by myself.' I said, 'Who was with me?' He said, 'You were by yourself,' and he said, 'I want you to meet me.' I said, 'Where do you want me to meet you?' He first said, 'Up at the Prescription Drug Store.' And he said, 'You will know me if you see me,' and I said, 'No, I wouldn't,' and he just kept talking and wanted me to—he said, 'Well, I tell you, you meet me at the Post Office,' and he told me how he dressed, and said, 'I'll be in the car.' And I told him how I was dressed, and he said he would remember me. So I called the police then."

On cross, counsel for the defendant brought up a pre-trial interview he had had with her. Part of this reads:

"Q   And do you recall me asking you: 'Up until that time you weren't frightened?' and you said: 'No, sir; not particularly.' Do you remember that?

"A   Well, that is when he first woke me up that I felt of his hair.

"Q   And then going on to what you told me, Mrs. T., didn't you then say to him: 'Get up and turn the light on so I can see your face.'?

"A   Yes, sir.

"Q   To which he replied: 'Lady, you don't want to see my face.'

"A   Yes, sir.

"Q   And, after some conversation with him, you walked to the front door ahead of him?

"A   Yes; and turned on the light.

"Q   And he left out the front door?

"A   Yes.

"Q   And before leaving he said: 'Can I call you one day?'

"A   Yes, sir.

"Q   To which you replied: 'Yes; you can call.'?

"A   Until I got him on the outside.

"Q   And then you latched the screen door and said, 'Don't you call me.'?

"A   'Don't you call me.'

"Q   To which the defendant answered: 'I have plenty of money.'?

"A   Yes.

"Q   And 'You wouldn't want for anything?'

"A   Yes.

"Q   And then went around the side of the house, walking, and put the screen back in the window?

"A   Yes.

"Q And walked back around the house and asked you not to call the police to which you said you wouldn't?

"A He told me I had better not call the police.

"Q What you told me was that he asked you not to call the police. And then he walked down the street, I believe you told me?

"A I don't know which way he went.

"Q He did walk away, didn't he?

"A As far as I know, he did.

"Q And then you sat down and cried for a while?

"A Yes.

"Q And then you called your niece, who was over at this girl's house, that you all had been with earlier in the evening?

"A Yes, sir.

"Q Apparently they had gone there from the V. F. W. Club. Is that right?

"THE WITNESS: Sir?

"MR. HAAS: Apparently your niece had gone from the V. F. W. Club to the other lady's house.

"A Yes, sir."

Under Pumphrey v. State, 156 Ala. 103, 47 So. 156, Denson, J., after criticising the breadth of language used by Manning, J., in McNair v. State, 53 Ala. 453, went on to say:

" * * * In the instant case, if the accused, * * * under the excitement of lust and with the intention of gratifying it by force, entered the bedroom of Mrs. Crimm, * * * about 10 o'clock in the night, and with such intention got upon her person, on the bed in which she was sleeping, though he abandoned his design upon her springing from the bed and opening the door, we apprehend that it could not be said, as a matter of law, that he was not guilty of an assault with intent to ravish.

"There is nothing in the evidence to indicate that Mrs. Crimm was not virtuous, or that she had ever had even a conversation with the accused; so that any idea or expectation of permissive intercourse could not have been entertained by the defendant at any time. * * * "

We note dictum of Somerville, J., in McQuirk v. State, 84 Ala. 435, 4 So. 775:

"It is true that the element of force need not be actual, but may be constructive or implied. If the woman is mentally unconscious from * * * sleep, * * * so that the act of the unlawful carnal knowledge on the part of the man was committed without her conscious and voluntary permission, the idea of force is necessarily involved in the wrongful act itself—the act of penetration. But even in cases of this kind the intent to use force, if necessary to accomplish the offense, is essential to criminality. 1 Whart.Crim.Law, (9th Ed.) § 550."

Pumphrey v. State, supra, alluded to "social customs, founded on race differences." We consider that—since our statutes do not make (and constitutionally cannot make) diversity of color an element of the charge—Denson, J., used the circumstance as an illustration of a factor which the jury might have borne in mind. Cf. Luker v. State, 39 Ala.App. 548, 105 So.2d 834 (white defendant convicted of rape on negro girl of 14).

In McGee v. State, 36 Ala.App. 276, 55 So.2d 223, Carr, P. J., gave the facts in part thus:

" * * * he drew a pocket knife and demanded that the prosecutrix remove her clothing. When she refused, he forcibly removed her shoes, socks, jeans, and bloomers, leaving her clad

only in a blouse and coat. The accused threw the girl down on the ground and unbuttoned his trousers, exposing his private parts. At this time the girl told the appellant that she had to urinate and asked to be permitted to step aside for this purpose. The permission was granted with the command that she return forthwith.

"The prosecutrix did not return, but instead ran to the residence where the beer had been secured.

"The officers found the girl's pocketbook in possession of the appellant when he was arrested later the same night. They also discovered her clothing at the place of the claimed assault."

The opinion continues:

"On the basis of this evidence we are urged to hold that in respect to the charge of assault with intent to rape the defendant was due the general affirmative charge.

"In approaching this review we are required to take the evidence in its most favorable light for the prosecution. Jones v. State, 33 Ala.App. 451, 34 So.2d 483; Womack v. State, 34 Ala.App. 487, 41 So.2d 429; Maxwell v. State, 34 Ala.App. 653, 43 So.2d 323.

"The rule by which we are guided is stated in Samuels v. State, 34 Ala.App. 13, 36 So.2d 561, 562: 'On a charge of assault with intent to commit rape, the evidence, to be sufficient to justify the conviction, must show such acts and conduct on the part of the accused as would leave no reasonable doubt of his intention to gratify his lustful desire against the consent of the female and notwithstanding resistance on her part.' See also, Wilson v. State, 22 Ala.App. 554, 117 So. 615; Pumphrey v. State, 156 Ala. 103, 47 So. 156.

"We do not think that it is necessary for us to analyze the evidence to illus-trate our view that a jury question was presented on the question of instant concern."

Why was the house broken and entered? Why was a man in bed with the prosecutrix?

The breaking and entering would support an inference that the intruder was not invited in. Upon an inference of unlawful entry, it is not too fanciful if the jury, in effect, says that a man getting in bed with a sleeping woman and kissing her had lubricous longings to possess her. And though he does not wake her, yet by his very stealth does he not betray an awareness of not being wanted?

Surely, if mere presence (in premises broken and entered) can furnish support for an inference to steal (Behel v. State, 40 Ala.App. 689, 122 So.2d 537), then all the more should it be rationally inferable that the defendant's conduct evinced a design to force himself upon the sleeping woman. Dormancy certainly cannot confer consent nor ratify. McQuirk v. State, supra.

Moreover, in weighing evidence toward intent to ravish, the jury must have before it more than a mere balancing of probabilities. The State must convince the jury *from the evidence* beyond a reasonable doubt.

"Because intent is an indispensable part of the crime, the defendant also is entitled, upon written request, to have the trial judge charge the jury that the State must prove intent (to steal or commit a felony) beyond a reasonable doubt. Code 1940, T. 7, § 273; Crane v. State, 111 Ala. 45, 20 So. 590 (re: refused charge 2); Lester v. State, [270] Ala. [631,] 121 So.2d 110 (burden of proof never shifts). The so-called need for the defendant's explaining his presence (in the circumstances posited) is merely a statement of (a) the fact of his pres-

ence being sufficient to let the case go to the jury, and (b) a warning that the risk of non-persuasion hangs over his head." Behel v. State, supra, 40 Ala. App. at p. 690, 122 So.2d at p. 539.

See also the posthumous opinion of Thomas, J., in Hawkins v. State, 247 Ala. 576, 25 So.2d 441, reversing the trial court for refusing defendant's offer of testimony on intent.

■ Therefore, certainly we consider, as a matter of law, the State made out a corpus delicti complete enough to justify the trial judge to take up the voluntariness of the defendant's confession.

Davis was arrested at a stake out near the Post Office, by policemen of the City of Prichard about noon July 29, 1962. He was put in the city's jail and booked on the nonexistent charge of "investigation."

About seven o'clock that night a detective and another officer received a confession. Davis therein wrote that he broke and entered prosecutrix's house one night. Further, he stated, "My intention was to rapee (sic) her. But I change (sic) my mind."

The State's evidence leaves an unexplained gap of seven hours between Davis's arrest and his confessing. He contended a red-headed policeman kicked him upside the head. A State witness denied there was a red-headed officer on the police force at that time.

The appellant would urge us to adopt the rule in McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819, since he was not—even after confessing—brought before a committing magistrate for five days.

Alabama, too, has such a statute as the federal one held critical in McNabb, Code 1940, T. 15, § 160, which reads:

"§ 160. It is the duty of any private person, having arrested another for the commission of any public offense, to take him without unnecessary delay before a magistrate, or to deliver him to some one of the officers specified in section 152 of this title, who must forthwith take him before a magistrate."

■ However, our courts have never taken noncompliance with § 160, supra, by itself alone as making a confession while under unlawful detention thereby involuntary. Ingram v. State, 252 Ala. 497, 42 So.2d 36 (reversing this court, 34 Ala.App. 597, 42 So.2d 30, because testimony of the subjective physical effect of contemporaneously undisclosed fear is an exception to the rule of exclusion in McGuff v. State, 248 Ala. 259, 27 So.2d 241).

■ Unlawful detention is but one criterion relevant as to whether or not a prisoner has been improperly induced to confess. Stein v. People of State of New York, 346 U.S. 156, 73 S.Ct. 1077, 97 L.Ed. 1522; Fikes v. State of Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246; Palmore v. State, 244 Ala. 227, 12 So.2d 854.

■ Payne v. State of Arkansas, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (isolation for a substantial period of time), needs to be contrasted with Crooker v. State of California, 357 U.S. 433, 78 S.Ct. 1287, 2 L.Ed.2d 1448, and Thomas v. State of Arizona, 356 U.S. 390, 78 S.Ct. 885, 2 L. Ed.2d 863. Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479, like McNabb, does not spring from the Federal Constitution: it is a rule of evidence in courts of the United States. It does not affect state courts. Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469; Smith v. Heard, 5 Cir., 315 F.2d 692 (Gewin, J.).

We have not only regarded the opinions of the Supreme Court of Alabama but have considered each of the natural law cases applying the Fourteenth Amendment to convictions where state courts have been reversed by the Supreme Court of the United States: Brown v. State of Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (173

Miss. 542, 158 So. 339, 161 So. 465). Chambers v. Florida, 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716, (136 Fla. 568, 187 So. 156). White v. Texas, 309 U.S. 631, 60 S.Ct. 706, 84 L.Ed. 989 (139 Tex.Cr.R. 660, 128 S.W. 2d 51, 141 S.W.2d 951). Canty v. Alabama, 309 U.S. 629, 60 S.Ct. 612, 84 L.Ed. 988 (238 Ala. 384, 191 So. 260). Lomax v. Texas, 313 U.S. 544, 61 S.Ct. 956, 85 L.Ed. 1511 (142 Tex.Cr.R. 231, 144 S.W.2d 555). Vernon v. Alabama, 313 U.S. 547, 61 S.Ct. 1092, 85 L.Ed. 1513 (240 Ala. 577, 200 So. 560). Ward v. Texas, 316 U.S. 547, 62 S.Ct. 1139, 86 L.Ed. 1663 (144 Tex.Cr.R. 444, 158 S.W.2d 516). Ashcraft v. Tennessee, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192. Malinski v. New York, 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029 (292 N.Y. 360, 55 N.E.2d 353). Haley v. Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed.2d 224 (147 Ohio St. 340, 70 N.E.2d 905). Watts v. Indiana, 338 U.S. 49, 69 S.Ct. 1347, 93 L.Ed. 1801 (226 Ind. 655, 82 N.E.2d 846). Turner v. Pennsylvania, 338 U.S. 62, 69 S.Ct. 1352, 93 L.Ed. 1810 (358 Pa. 350, 58 A.2d 61). Harris v. South Carolina, 338 U.S. 68, 69 S.Ct. 1354, 93 L.Ed. 1815 (212 S.C. 124, 46 S.E.2d 682). Johnson v. Pennsylvania, 340 U.S. 881, 71 S.Ct. 191, 95 L.Ed. 640 (365 Pa. 303, 74 A.2d 144). Leyra v. Denno, 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948 (reversing 2 Cir., 208 F.2d 605). Cf. People v. Leyra, 304 N.Y. 468, 108 N.E.2d 673. Fikes v. Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (263 Ala. 89, 81 So.2d 303). Payne v. Arkansas, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (226 Ark. 910, 295 S.W.2d 312). Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (4 N.Y.2d 256, 150 N.E.2d 226). Blackburn v. Alabama, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (264 Ala. 694, 88 So.2d 205). Rogers v. Richmond, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (2 Cir., 271 F.2d 364 reversed). Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (147 Conn. 194, 158 A.2d 239). Reck v. Pate, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (People v. Reck, 392 Ill. 311, 64 N.E. 2d 526; habeas corpus United States ex rel. Reck v. Ragen, 274 F.2d 250). Gallegos v. Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (145 Colo. 53, 358 P.2d 1028). Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (7 Cir., 276 F.2d 324). Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (affirming 2 Cir., 300 F.2d 345). Lynumn v. Illinois, 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (21 Ill.2d 63, 171 N.E.2d 17). Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (58 Wash.2d 716, 364 P.2d 935).

It is apparent that no precise codifiable formula has arisen from these cases or from instances of affirmances such as Lisenba v. California, 314 U.S. 219, 62 S.Ct. 280, 86 L.Ed. 166. At most, we can note instances of: (1) The preponderance of (a) capital cases [as here], (b) Negro defendants [as here]; (2) (a) actual torture and (b) lynch threats becoming rare in late cases; (3) long detention incommunicado; (4) psychological tricks or ploys; (5) denial of counsel; (6) youth; (7) low mental age; (8) slight schooling; (9) repeated questioning by different interrogators directed at seeming inconsistencies; or (10) mention of prisoner's family circumstances.

Wigmore, Evidence (3d Ed.), § 851, at p. 319, states:

"In the first place, an innocent person is always helped by an early opportunity to tell his whole story; hundreds of suspected persons every day are set free because their story thus told bears the marks of truth. Moreover, and more important, every guilty person is almost always ready and desirous to confess, as soon as he is detected and arrested. This psychological truth, well known to all criminal trial judges, seems to be ignored by some Supreme Courts. The nervous pressure of guilt is enormous; the load of the deed done is heavy; the fear of detection fills the consciousness; and when detection comes, the pressure is relieved; and the deep sense of relief makes confession a satisfaction.[3] At that moment, he will tell all, and tell it truly.

To forbid soliciting him, to seek to prevent this relief, is to fly in the face of human nature. It is natural, and should be lawful, to take his confession at that moment—the best one. And this expedient, if sanctioned, saves the State a delay and expense in convicting him after he has reacted from his first sensations, has yielded to his friends' solicitations, and comes under the sway of the natural human instinct to struggle to save himself by the aid of all technicalities."

---

"3. Read Balzac's description of this in 'Lucien de Rubempre', c. XV, and 'The Last Incarnation of Vautrin', c. II; also Daniel Webster's speech at the Knapp-Crowninshield Trial. Psychologists report that their studies have not yet taken up this phenomenon. But so well established a fact should be supplied with its scientific explanation. That explanation seems to be that the long-continued nervous inhibition of all utterance, in fear of revealing clues to guilt, imposes a terrific strain, like that of a tightened steel spring; that the arrest shows the guilty person that this strain of repression is futile and is no longer needed; and that hence, in the sudden release of the inhibition, it is a genuine relief to be able to tell freely the whole story. After this sense of nervous relief has passed, the inclination to tell disappears; and most confessions are in fact made within a short time after arrest."

---

Wigmore's reference to psychological studies in the footnote above quoted can now be supplemented and his statement of "psychological truth" borne out by the British neurosurgeon and psychiatrist, Sargant, in his classic on brainwashing, *The Battle for the Mind*. It is not clear whether Sargant treats the constable's charge under Rule 2 of the Judges' Rules requiring a caution or formal magisterial examination as the point of highest crest of guilt relief afforded by confession.

Thus, on the evidence in the record before us, Davis was first specifically accused of the burglary at about 7:00 P.M. and forthwith admitted his guilt and proceeded to write a confession in his own hand. There was no expert evidence either pro or con as to Davis's susceptibility to make a false or true admission. He was shown to be forty-three years old.

If Wigmore and Sargant are valid in their observations as to the reliability and fulness of an accused's statement on being first accused, then this is a circumstance which would support the trial judge's ruling on admissibility. Certainly, the absence of any showing of mental weakness or excitability is not chargeable to the State.

In State v. Tune, 13 N.J. 203, 98 A.2d 881 (a criminal discovery matter), Vanderbilt, C. J., after quoting Wigmore, § 851, supra, added:

"Our experience in State v. Cooper, 2 N.J. 540, 67 A.2d 298 (1949) and 10 N.J. 532, 92 A.2d 786 (1952), commonly known as Trenton Six Case, bears out Dean Wigmore's point of view, for there on the sentencing of Cooper he voluntarily reaffirmed his earlier confession implicating most of the defendants."

In State v. Browning, 206 Ark. 791, 178 S.W.2d 77, the defendant was arrested (without a warrant) between eleven o'clock and noon, questioned at intervals and confessed at about six, P.M. The court quoting from Wigmore, § 851, rejected McNabb v. United States, supra, as controlling.

Because the defendant's confession contains a statement of his intent at the time of entering the house, and since this statement was made more than a month after the event, it seems that the Attorney General is concerned about the application of the rule of exclusion in McGuff v. State, supra, to the use of the confession in the State's case in chief.

We find the following in the State's brief:

"Should the Court be concerned about the privilege of an accused to admit to the requisite intent, reference is made

to People v. Rhodes, 137 Cal.App. 385, 30 P.2d 1026 [relying on Fanning v. Green, 156 Cal. 279, 104 P. 308]; however, it seems to the writer that admission of intent is merely a statement against interest and should be admitted as evidence on that basis alone."

Conrad v. State, 154 Tex.Cr.R. 624, 230 S.W.2d 225, holds that a confession which contains the only evidence of intent in a burglary is binding on the state. That is, the confessor is looked on as the State's own witness, ad hoc, who has not invoked the privilege against self crimination. The defendant's confession, along with possession of recently stolen goods, sufficed to show intent in Webster v. State, Tex.Cr. App., 369 S.W.2d 355. See also State v. Lira, Mo., 372 S.W.2d 80.

We expressly refuse to consider that the McGuff rule would operate to exclude the confession in the instant case for two reasons: (1) There was no objection made to the introduction of the confession on this ground, one which has nothing to do with the confession's being voluntary or coerced; and (2) we doubt if the McGuff rule can be applied in such a way as to cut off the defendant's right to explain his conduct where another rule of law, such as prevails in burglary, permits an inference as to his undisclosed state of mind from very slight evidence adduced on the part of the State.

■ The State has the burden to show that a confession is voluntarily made. The extent of this onus, at the least, requires a complete account of the entire setting, personnel, and circumstances of the occasion on which the accused is claimed to have confessed. Carr v. State, 17 Ala.App. 539, 85 So. 852, relying on Peck v. State, 147 Ala. 100, 41 So. 759. Minirth v. State, 270 Ala. 228, 117 So.2d 360 (as to failure to account for accomplice who was present).

Judge Bricken's opinion in Carr, supra, says in part:

"* * * in order to properly overcome the presumption of its incompetency it should conclusively appear that it was wholly given at the volition of the accused, free from coercion of the character discussed, not only from the witness who gives testimony of the confession, but also from all others in the presence or hearing of the witness and accused at the time, *or even prior to the time,* the confession was made." (Italics added.)

R. v. Swatkins, 4 C. & P. 549, contains a colloquy between bench and bar from which Wigmore (§ 860) deduces an attitude that the English Courts would require the prosecution to produce all officers who have been in the presence of the prisoner from the time of their first contact with him until he confesses. We do not take Swatkins to hold thus. Nor do we take the italicized language of Judge Bricken in the excerpt from Carr to so intend. Rather, we think it meant to extend only to prior time shown to be necessarily connected with the occasion of confession.

In Hopt v. Utah, 110 U.S. 574, 4 S.Ct. 202, 28 L.Ed. 362, a contention of this type was rejected. The court said:

"* * * The circumstances narrated by the witness proved the confession to be voluntary, so far as anything was said or done by him on the immediate occasion. There was nothing disclosed which made it the duty of the court to require, as a condition precedent to the admission of the evidence, that the prosecution should call the policeman and show that he had not, when alone with the accused, unduly influenced him to make a confession."

And in Logan v. State, 251 Ala. 441, 37 So.2d 753, the court, per Simpson, J., states:

"* * * the State, having established by the preliminary proof the voluntary nature of the confession, was not required to examine every witness pres--

ent when the confession was made or to array for interrogation every person who might have had access to or conversation with the prisoner during his incarceration in order to remove the prima facie presumption of involuntariness."

■ In sum we conclude that, under the rulings of both the Alabama Supreme Court and the Supreme Court of the United States, the trial court did not err in admitting the confession.

On the afternoon after Davis confessed, Mr. Haas, his counsel, came to the Prichard City Jail to consult with Davis. They were allowed to use a large room but were not left alone.

We excerpt from the evidence in pertinent part:

"* * * At the time I arrived at the docket room, several of the officers who knew me spoke to me in a friendly fashion, until it was determined that I was there to see Robert Lee Davis, at which time their friendliness stopped. I was made to wait quite some time, and finally they brought Robert Lee down out of the jail, apparently out of the jail, put him into a room off of the main docket room with me. From the very beginning, continuously, while I ,tried to discuss this matter that Robert Lee wanted to hire me for—from the very beginning, various Prichard police officers would come into the room and listen. Finally I requested that I be allowed to discuss the matter with my client in privacy— I got no reply from the office [sic—officer?] I spoke to. They continued to come in and out, and I finally gave up trying to talk to Robert. I got the basic information, and could not further discuss it with him until after he got out on bond after the preliminary hearing. I would further like to state that one of the officers, whose name I did not know, and I'm not even

certain he was an officer, but he was in civilian clothes, and apparently was an officer, made the statement that 'Robert ought not [to] be tried, he ought to be just beat to death.' * * "

No showing as to repetition of the eavesdropping was made.

■ This incident coming after the confession was made cannot, as a matter of law on this review, afford ground for reversal. It might show hostility and bias and thus bear on the credit which might be accorded the testimony of the officers who took the confession.

However, we cannot here go beyond this observation. Undoubtedly, had counsel applied for the proper writ, the circuit court would have granted him private audience with his client. See Johnson v. State, 242 Ala. 278, 5 So.2d 632. 14 Am.Jur., Criminal Law, § 171; Cornell v. Superior Court, 52 Cal.2d 99, 338 P.2d 447, 72 A.L.R.2d 1116.

The majority opinion in Crooker v. California, 357 U.S. 433, 78 S.Ct. 1287, 2 L.Ed. 2d 1448, points out that denial of a request for counsel made *before* confessing would not, as a solitary circumstance, make the confession inadmissible. Cicenia v. La Gay, 357 U.S. 504, 78 S.Ct. 1297, 2 L.Ed.2d 1523. A fortiori, then here where no request was shown.

In view of the remedy to correct refusal of privacy to an attorney and client, ordinarily after verdict we see no ground for reversible error. This was but a single instance which here took place fully two and a half months before indictment and five and a half months ahead of trial. The record shows the defendant was admitted to bail August 3, 1962—less than a week after he was arrested.

We have reviewed the entire record as required by law and consider the judgment below is due to be

Affirmed.