### L. C. NEWMAN V. THE STATE.

No. 23068. Delivered April 25, 1945.
Rehearing Denied May 23, 1945.
Appeal to Supreme Court of United States.
Mandate of Supreme Court of United States, Denying the Petition for
Writ of Certiorari, filed November 23, 1945.

646

The opinion states the case.

*V. A. Collins* and *Ernest A. Coker,* both of Livingston, for appellant.

*James M. Crane,* District Attorney, of Conroe, *Z. L. Foreman,* of Livingston, and *Ernest S. Goens,* State's Attorney, of Austin, for the State.

DAVIDSON, Judge.

Appellant was convicted of the murder of Margaret Naff by beating her to death with a soldering iron, and given the death penalty. The motive was robbery, which was effectuated.

The deceased, seventy years of age and a cripple, lived with her son, John Naff, on a little farm about three miles from the town of Camden in Polk County. On Sunday morning, August 27, 1944, the son left home to go to Camden, where he worked. Upon his return that night about nine o'clock, he found his mother lying on the edge of the bed, dead as the result of a crushed skull, with some ten wounds inflicted thereon. He notified the family physician, friends, and the officers. During leisure hours the son did radio repair work at home and among the tools used in that work was a soldering iron, an iron instrument with a copper tip. The deceased kept in the house small sums of money in a coin purse. Aubrey Lyons, brother-in-law of appellant, lived about one-half mile from the Naff home, to reach which it was necessary to cross what is referred to as McManus Creek. Webb Boyd, an elderly negro, lived with Aubrey Lyons. The appellant, during the week prior to the killing, visited in the Lyons home. Peace officers, upon being notified of the murder, arrived at the Naff home about midnight—or three hours after the discovery of the body. Tracks were found which caused them to go to the Lyons home where they placed Webb Boyd under arrest. About four o'clock, a.m., Monday morning, the appellant—asleep when the officers arrived—was arrested at the home of Lum Colquitt at Camden and taken to the jail at Livingston.

The State used in evidence appellant's written confession—consisting of eleven typewritten pages—in which he admitted that he and Webb Boyd killed the deceased by beating her on the head with the soldering iron which, at the time the confession was made, had been found as a result of information furnished by appellant; that after inflicting the fatal blows he and Boyd placed the deceased on the bed; that he took from the house the coin purse containing $6.15; that he threw the soldering iron into some small pine bushes near the house where it was subsequently found by the officers. According to the confession, the killing was the result of a conspiracy—entered into by and between him and Boyd three days prior—to rob the deceased.

Testifying as a witness in his own behalf, appellant repudiated the confession, saying it was made only as a result of his

having been whipped by the officers. He repudiated the incriminating features thereof and asserted that he was innocent of any connection with the death of the deceased. He explained that he knew the location of the coin purse and that it could be found in McManus Creek by saying that he saw Boyd throw it there. He denied any knowledge of the soldering iron, its location, or connection therewith.

No finger-prints were found on the coin purse, soldering iron, or articles of furniture in the house. Blood was on the floor and walls of the room and on and under the bed upon which the body of deceased was lying when discovered. Upon the shirt, trousers, and shoes which appellant was wearing at the time of his arrest, there were found small spots of blood, those on the shirt being to the side. Upon the soldering iron were found traces of blood and hair corresponding to that on the head of deceased.

The confession, upon its face, as also the testimony offered as a predicate for its introduction, showed that it had been made freely and voluntarily, in accordance with the statute of this State (Art. 727, C.C.P.) governing the taking of confessions and that before the making of the confession, appellant was warned that he did not have to make any statement and that any statement he made could be used in evidence against him and after such warning the confession was voluntarily made.

Appellant interposed no objection to the introduction of the confession in evidence. No bill of exception, which under the laws of this State is a prerequisite to a consideration upon appeal of the admissibility of testimony, complaining of the receipt in evidence of the confession, accompanies this record. The question of the admissibility of the confession in evidence is not before us.

By motion for new trial and after the verdict, appellant challenged the validity of the judgment of conviction because, as he then claimed, it was based upon his involuntary confession, which constituted as to him a denial of due process as guaranteed by the Fourteenth Amendment to the Federal Constitution. The question of a denial of due process as thus presented is fundamental and is before us for determination.

The trial court, recognizing that under appellant's testimony an issue of fact arose as to voluntariness of the confession, submitted that issue to the jury, along with the trial of the case on its merits—as is the long established rule in this State—and

instructed the jury not only as to the statutory requisites necessary to be followed in making a valid confession but also instructed the jury that if they entertained a reasonable doubt as to whether the confession was freely and voluntarily made or induced by duress, threats, coercion, fraud, persuasion, promise of immunity or other improper influences, the confession should be disregarded and could not be considered by them for any purpose whatsoever. The trial court also instructed the jury that if they entertained a reasonable doubt that the officers inflicted any physical or mental pain upon the appellant, as a result of which the appellant made statements which conduced to establish his guilt—such as the finding of the instrument with which the offense was committed—then the statement so made could not be considered for any purpose.

In addition to these instructions, the trial court, at the request of the appellant, instructed the jury that, if they believed or entertained a reasonable doubt that the appellant suffered any punishment or was in fear at the time any statement was made by him, they could not consider such statement for any purpose.

We are unable to see wherein the trial court could have more effectually guarded before the jury appellant's contention that the confession was not voluntary on his part, especially in view of the fact that—according to his testimony—no other influence prompted him to make the confession save and except the physical punishment which he claimed was imposed by the whipping inflicted by the officers whom he named.

The procedure thus employed by the trial court was in complete accord with the established rules and precedents of this State. See authorities listed under Art. 727, Note 20, Vernon's C. C. P.

The question of a denial of due process as thus presented raises a federal question within the jurisdiction of the Supreme Court of the United States.

Touching the question of the trial and conviction in State courts upon a confession of the accused, the Supreme Court of the United States has announced certain rules, chief among which are:

A conviction in a State court for the violation of a State law, based in whole or in part upon the involuntary confession of the accused, constitutes a denial of due process as guaranteed

by the Fourteenth Amendment to the Federal Constitution, which nullifies the conviction.

The voluntary or involuntary character of a confession is determined by a conclusion as to whether the accused at the time he confesses is in possession of mental freedom to confess or to deny a suspected participation in a crime and to determine which the Supreme Court of the United States will itself make an independent examination of the facts and, from that examination, reach a conclusion based upon what it finds to be the conceded and uncontroverted facts.

No formula to determine when due process has been denied by the use of an involuntary confession by its application to the facts of a given case can be devised.

As applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice. Chambers v. Florida, 309 U. S. 227, 84 L. Ed. 716, 60 S. Ct. 472; Brown v. Mississippi, 297 U. S. 278, 80 L. Ed. 682, 56 S. Ct. 461; White v. Texas, 310 U. S. 530, 84 L. Ed. 1342, 60 S. Ct. 1032; Lomax v. Texas, 142 Tex. Cr. R. 231, 144 S. W. (2d) 555, 313 U. S. 544, 85 L. Ed. 1511, 61 S. Ct. 956; Ward v. Texas, 316 U. S. 547, 86 L. Ed. 1663, 62 S. Ct. 1139; Lisenba v. California, 314 U. S. 219, 86 L. Ed. 166, 62 S. Ct. 280; Hysler v. Florida, 315 U. S. 411, 316 U. S. 642, 86 L. Ed. 932, 62 S. Ct. 688; Ashcraft v. Tennessee, 322 U. S. 143, 88 L. Ed. 1192, 64 S. Ct. 921; Malinski v. New York, Decided March 26, 1945, not yet reported.

By these decisions, there is no escape from the conclusion that the Supreme Court of the United States has potential jurisdiction in all State cases where it is claimed by the accused that the conviction was based upon his involuntary confession.

Such being true, the position this Court occupies in relation to such cases is both unique and difficult—unique, in that by the Constitution and the laws of this State (Const. Art. 5, sec. 5; Art. 812, C. C. P.) we are the court of last resort in criminal cases. If we reach a conclusion that the confession was involuntary, such conclusion is binding upon the State and society, for under our Constitution (Art. 5, sec. 26) the State is expressly denied the right of appeal in a criminal case and is therefore barred from seeking a review of that conclusion by the Supreme Court. On the other hand, if we conclude that the confession was voluntary, such conclusion is in no sense final, bind-

ing the accused only until reviewed by the Supreme Court of the United States.

The difficult feature of our position rests in the fact that we are called upon to determine the question from a dual standpoint—first, under the laws and decisions of this State and second, under the decisions of the Supreme Court of the United States. The latter, being conclusions reached by the Court from its examination of the particular facts of each case, constitute a precedent or guide only in cases involving the same fact situations.

If the Supreme Court would prescribe some formula by which we may be guided, our task would be much easier but that Court recognizes that no formula can be devised.

It is in the light of this situation we approach a determination of the question before us, which is:

Was the appellant, at the time he made the confession, in possession of mental freedom to confess to or deny his guilty participation in the crime shown by the confession?

We look to the facts touching the making of the confession. About four o'clock Monday morning—something like seven hours after the discovery of the crime—appellant was arrested and taken into custody by the arresting officers at the home of Lum Colquitt at Camden, about three miles from the scene of the crime. He was carried to and placed in jail at Livingston, about thirty miles distant. Monday afternoon some twelve or fourteen hours after his arrest and while in jail, appellant gave to the officers the shirt he was wearing. A portion of the right sleeve of the shirt had been torn off and was missing from the shirt. Deputy Sheriff Walker, one of the arresting officers, remembering that the shirt sleeve had not been torn off at the time of the arrest, called attention to such fact. A search was made in the jail for the missing portion of the sleeve but it was not found. Appellant explained that on the night of and prior to his arrest he had gotten into a difficulty with one Logan near the Harwood Mill at Camden, during which the sleeve was torn and after which he tore the sleeve from the shirt and threw it out by the side of the road in the vicinity of the mill. It appears that the suspicion of the officers was aroused relative to the missing sleeve; that they believed the sleeve had been torn off and hidden—after arrest—to destroy some criminative fact evidenced thereby. If the sleeve had been torn off and was missing from the shirt at the time of arrest, such suspicions

would be without foundation. It was to appellant's advantage that the search for the missing sleeve be made and, if it had been found where he claimed it had been thrown, it would have corroborated him. As a consequence—and if not at appellant's request, certainly with his consent and acquiescence—Officers Walker and Hicks and Galloway took appellant from jail that Monday night and carried him to the place where he said the shirt sleeve had been thrown away. A thorough search was made for the sleeve and it was not found. Following this, the officers started upon the return trip to Livingston. Appellant says that the officers carried him off the road and near a certain church; that Officers Walker and Hicks whipped him across the back, hips, and breast with a rubber hose three or four feet in length, while he was handcuffed to a tree; that during this whipping he was interrogated by the officers as to what he knew about the murder of Mrs. Naff (deceased); that after this whipping he was returned to and placed in jail at Livingston some time Monday night. Appellant did not claim that Officer Galloway whipped him or was a party thereto. To the contrary, upon cross-examination, he admitted that Galloway had never mistreated him. Officers Walker, Hicks, and Galloway denied that appellant was whipped by them on the occasion mentioned or that he was whipped or mistreated by anyone in their presence at any time. Following his return to jail, appellant was that same night, while in jail, questioned by the officers—including a captain of the Rangers. The record does not reflect the length of time consumed in this talk. The captain of the Rangers said he talked to him about an hour. In this conversation, the appellant told the officers where the purse and soldering iron could be found, as a consequence of which the officers—about three o'clock Tuesday morning—went to the scene of the crime and there searched for the purse and soldering iron in accordance with the directions appellant had given them. If appellant was present at this time, he did not participate in the search. The officers were unable to find either the purse or the soldering iron. They returned to Livingston some time Tuesday morning. Tuesday afternoon the officers again questioned appellant while in jail and told him they were unable to find the purse and soldering iron as a result of what he had told them.

It appears that, following this, appellant made what is referred to as the first written statement. This first statement was not offered in evidence. We do not know its contents.

Following the making of this statement and about ten o'clock Tuesday night, the officers—together with the appellant—went

again to the scene of the crime to search for the purse and soldering iron. Captain Purvis of the Rangers said that it was at appellant's request that he went with them on this trip. Upon reaching the water hole on McManus Creek, appellant waded out into the water and there found the purse which was positively identified as the purse which deceased kept at her home. Following this and in the vicinity where appellant told the officers he had thrown it, the soldering iron was found. Appellant was then returned to jail.

It appears that the officers claimed parts of the first written statement were untrue. In what particular, it does not appear. The inference to be drawn is that the falsity was connected in some manner with the directions for the finding of the purse and soldering iron.

Thereafter, on Wednesday night, he was carried to the office of the firm of lawyers of which special counsel for the prosecution was a member and there—after questioning—he made the written confession which was used in evidence. The statement was first dictated to a stenographer and then reduced to writing. The over-all time consumed was about four hours. According to the testimony of Hooks, one of the attesting witnesses to the statement who had known appellant all his life said that he was present in the room during the making of the confession, together with Morrison, the other attesting witness, the sheriff, the special prosecutor, and the stenographer. He said that Deputy Sheriff Walker, who appellant claimed was one of the parties that whipped him, came into the room after the statement had been transcribed and while it was being read over to the appellant by the stenographer. Walker was not present in the room at any time while the statement was being made. There was testimony showing that other peace officers, including some of the Rangers, were in the building but not present at any time where and during which time the statement was made and signed.

According to the testimony for the State, the statement was freely and voluntarily made by the appellant after due warning by the sheriff to whom it was made that he did not have to make a statement and that any statement he made must be voluntary on his part. Appellant did not deny that such warning was given.

Between the making of the first and second written statement, appellant claims that he was again whipped by Officers

Walker and Hicks—as to which he gives neither the time, place, nor the circumstances under which it occurred. The denial of the officers named also covered this matter.

Appellant by his testimony claimed that when he was taken to the law office where the second written statement was made, Webb Boyd was also present and that at that time he saw the special prosecutor slap Boyd in the face. No other person so testified. The special prosecutor denied it.·

Notwithstanding the fact that appellant complained· he was severely beaten during the whippings, he made no complaint thereof to any one of the officers having him in custody. He sought no medical attention. The shirt he was wearing at the time furnished no supporting fact or circumstances. Even though upon the trial of the case occurring about a month after the alleged whipping, appellant made profert of his body and charged there were, then, welts upon his body made by the whipping, no supporting witness attested the fact that there were any welts upon his body at that time.

In view of all this testimony, the claim of appellant that he was whipped by the officers—being so abundantly disproven—must of necessity pass from consideration and be here treated as not having occurred.

The time consumed in the questioning, transcribing, and signing of the second written statement or confession did not exceed four hours, which appears to be the longest period of time that appellant was at any one time questioned by the officers.

Appellant is an ignorant, untutored, twenty-four year old negro, having completed only the third grade in school. Upon cross-examination he completely exonerated all the officers who at any time had him in custody—including the special prosecutor—except Walker and Hicks, of having mistreated him at any time.

By his own testimony appellant claimed that the confession used by the State was involuntary only by reason of his having been whipped by the officers and the fear that he would be whipped or beaten again. Appellant not having been whipped or beaten by the officers prior to the making of the confession, credence can hardly be given to his testimony that he feared further whippings and beatings at their hands. Appellant ex-

plained his knowledge of the location of the soldering iron and purse in consonance with his denial of guilt.

According to our viewpoint, the undisputed facts touching the making of the confession may be summarized as (1) appellant—after his arrest at night—at his acquiescence and benefit, was taken from jail to the place he designated to search for the missing shirt sleeve; (2) as a result of the questioning by the officers while in jail, appellant made an oral as well as a written statement which, together with appellant's voluntary assistance, led to the finding and recovery of the instrument with which the murder was committed and some of the fruits thereof; and (3) the written confession was made after the disclosures and discoveries aforesaid after questioning in the law office of the special prosecuting attorney to and in the presence of persons who, appellant admitted is an ignorant, untutored negro way at any time; (4) appellant is an ignorant, untutored negro man.

The foregoing are what we conceive to be the facts touching the making of the confession, as we have been able to ascertain them from a painstaking examination of the record.

The question arises: Do the prior decisions of the Supreme Court of the United States serve as a guide by which we may arrive at a correct conclusion as to whether the confession here involved was involuntary?

The facts upon which this issue must of necessity turn appear to be that appellant is an ignorant, untutored negro man and the confession was made after questioning by the officers while he was in jail. We do not have here a case where the undisputed facts show the infliction of physical punishment, long-continued questioning and third-degree methods, questioning at night in remote wooded sections, adverse sentiment of the community or danger of mob violence—assumed or actual—or any other features which appear to have controlled the Supreme Court in the conclusion that the confession was involuntary, as expressed in the cases heretofore mentioned. The only fact here presented which appears to be common to such cases is that the accused is ignorant and untutored.

The case which appears to be nearer in point of facts to the instant case is that of Lomax v. Texas, supra. In that case we have what has always appeared to us to be a most peculiar decision. There the Supreme Court elected not to set forth the

facts in its opinion upon which it reached the conclusion that the confession was involuntary—contenting itself, rather, by disposing of the matter by per curiam opinion and citing as the basis therefor the case of Chambers v. Florida, supra, and White v. Texas, supra. No other construction may be placed upon the Lomax decision save and except that the Supreme Court found the facts to be set forth in the opinion of this Court (144 S. W. (2d) 563-4) and upon the facts as there stated reached the conclusion that the confession was involuntary. From those facts it appears that Lomax, after he had been arrested and placed in jail, was by the officers brought from the jail down to the grand jury room in the court house and there questioned as to his whereabouts on the night of the alleged offense. The questioning on that occasion occurred during the day time for a period of from fifteen to thirty minutes, during which time his clothing was removed and he was required to stand. Later at night of the same day Lomax was again questioned by the officers and for a period of about four hours, when he confessed. No force or physical violence was exercised by the officers. Lomax did not by his testimony claim that he was forced to make the confession nor did he challenge its voluntariness or deny that the facts stated in the confession were true. Notwithstanding such facts, the Supreme Court reached the conclusion that the confession was involuntary, overruling the contrary finding of the jury and courts of Texas.

If Lomax v. Texas, supra, holds that the confession of an ignorant, untutored negro man—obtained after and by questioning while under arrest—is an involuntary confession, it is direct authority supporting the appellant's contention that the confession in the instant case was involuntary. Did the Supreme Court intend that the Lomax case be given that construction and, if so, has that Court subsequently modified that holding? Whatever construction the Supreme Court intended to be given to the Lomax case, we think it has been modified by subsequent decisions of the Supreme Court.

In Lyons v. Oklahoma, supra, where the confession of a twenty-one or two year old man was held not voluntary, we find this rule announced:

"The mere questioning of a suspect while in the custody of police officers is not prohibited either as a matter of common law or due process."

Cited in support thereof are the cases of Lisenba v. Cali-

fornia, supra, and Ziang Sun Wan v. United States, 266 U. S. 1, 14, 69 L. Ed. 131, 148, 45 S. Ct. 1.

It appears, therefore, that a confession obtained merely as the result of questioning the suspect while in jail is not of and within itself an involuntary confession.

But Lyons v. Oklahoma, supra, has a deeper and more significant bearing upon the instant case than merely announcing the rule quoted. Such lies in the fact that there the Supreme Court gave far more weight and concern to the finding of the jury upon the issue of voluntariness of a confession than it had theretofore accorded. We base that conclusion upon the following expression:

"The question of how specific an instruction in a state court must be upon the involuntary character of a confession is, as a matter of procedure or practice, solely for the courts of the State. When the state-approved instruction fairly raises the question of whether or not the challenged confession was voluntary, as this instruction did, the requirements of due process, under the Fourteenth Amendment, are satisfied and this Court will not require a modification of local practice to meet the views that it might have as to the advantages of concreteness. The instruction given satisfies the legal requirements of the State of Oklahoma as to the particularity with which issues must be presented to its juries, Lyons v. State,—Okla. Crim. App.—, 138 P. (2d) 142, 164, and in view of the scope of that instruction, it was sufficient to preclude any claim of violation of the Fourteenth Amendment."

Also this further expression in that case: "When conceded facts exist which are irreconcilable with such mental freedom, regardless of the contrary conclusions of the triers of fact, whether judge or jury, this Court cannot avoid responsibility for such injustice by leaving the burden of adjudication solely in other hands. But where there is a dispute as to whether the acts which are charged to be coercive actually occurred, or *where different inferences may fairly be drawn from admitted facts, the trial judge and the jury are not only in a better position to appraise the truth or falsity of the defendant's assertions from the demeanor of the witnesses but the legal duty is upon them to make the decision.* Lisenba v. California, supra." (Emphasis supplied).

If doubt existed that the Supreme Court in Lyons v. Oklahoma, supra, intended to give a broader effect and meaning to

the conclusion of the jury and the judgment of the State in determining the voluntariness of a confession, then it appears that such doubt was eliminated by the expressions of Mr. Justice Frankfurter, concurred in by Mr. Chief Justice Stone, Mr. Justice Roberts, Mr. Justice Reed, and Mr. Justice Jackson, relative to the meaning of due process as guaranteed by the Fourteenth Amendment, as applied to a State court conviction for crime, in Malinski v. New York, supra, wherein he said: "And so, when a conviction in a state court is properly here for review, under a claim that a right protected by the Fourteenth Amendment has been denied, the question is not whether the record can be found to disclose an infraction of one of the specific provisions of the first eight amendments. To come concretely to the present case, the question is not whether the record permits a finding, by a tenuous process of psychological assumptions and reasoning, that Malinski by means of a confession was forced to self-incrimination in defiance of the Fifth Amendment. The exact question is whether the criminal proceedings which resulted in his conviction deprived him of the due process of law by which he was constitutionally entitled to have his guilt determined. Judicial review of that guaranty of the Fourteenth Amendment inescapably imposes upon this Court an exercise of judgment upon the whole course of the proceedings in order to ascertain whether they offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most henious offenses. These standards of justice are not authoritatively formulated anywhere as though they were prescriptions in a pharmacopoeia. But neither does the application of the Due Process Clause imply that judges are wholly at large. The judicial judgment in applying the Due Process must move within the limits of accepted notions of justice and is not to be based upon the idiosyncracies of a merely personal judgment. The fact that judges among themselves may differ whether in a particular case a trial offends accepted notions of justice is not disproof that general rather than idiosyncratic standards are applied. An important safeguard against such merely individual judgment is an alert deference to the judgment of the state court under review. But there cannot be blind acceptance even of such weighty judgment without disregarding the historic function of civilized procedure in the progress of liberty."

These expressions by the Supreme Court, or a majority of the Justices comprising that Court, cause us to conclude that the construction placed upon Lomax v. Texas, supra, was either

incorrect, not intended, or has been modified by the Lisenba, Lyons, and Malinski cases.

In the light of these expressions it appears now to be the rule that "where different inferences may fairly be drawn from the admitted facts," the Supreme Court of the United States in appraising the claim of an accused that a confession was involuntary will give an "alert deference" to the finding of the jury and the judgment of the trial court. In other words, all things being equal, the jury's findings—while not final—will receive definite consideration.

It must be remembered that the question here presented is not whether the facts set forth in the confession were true or untrue but rather whether appellant at the time he made the confession was in possession of mental freedom to deny his guilty participation in and connection with the murder, as he did upon the trial of the case, or admit it as he did in the confession, or to refuse to answer.

If appellant was really not guilty of the crime, what influence or influences operated upon his mind that caused him to confess it? According to his own testimony he made the confession only because he feared other whippings and beatings by the officers. According to the overwhelming testimony, he had not been whipped or beaten by the officers at any time. Credence could hardly, then, be given to his claimed fear of other and additional mistreatment by the officers.

Did appellant confess because of his voluntary acts and conduct in the recovery of the instrument and fruits of the crime and a consciousness of guilt? The inference that such facts prompted the making of the confession is as tenable as is the inference that he was forced or coerced by the officers to make the confession.

Was the attack upon the confession, upon trial of the case, really because he had been forced to make it or was that attack an endeavor to escape punishment for the horrible crime he had voluntarily admitted? The inference of the one is as tenable as the other.

The facts in evidence, the various inferences to be drawn therefrom, and the demeanor of the witnesses, including appellant, were primarily for the jury. Under the full, fair, and guarded instructions of the trial court to the effect that if they

entertained a reasonable doubt that the confession was voluntary and freely made, or induced by duress, threats, fraud, persuasion, or through any other improper influence it could not be considered by them for any purpose, the jury reached the conclusion that it was not involuntary. The trial judge, who had the equal opportunity of hearing the testimony and of observing the demeanor of the witnesses, approved that finding by his action in overruling the motion for new trial.

It has long been the established practice in this State, where an issue of fact arises as to the voluntariness of a confession, to submit that issue, under appropriate instructions, to the jury for determination along with the trial of the case upon its merits. Authorities attesting the rule will be found collated under Note 20 of Art. 727, Vernon's Code of Criminal Procedure. Under such practice the jury's finding is determinative of the question unless that finding be not supported by or against the undisputed facts, in which event the jury's finding will be set aside. Williams v. State, 88 Tex. Cr. R. 87, 225 S. W. 177; Abston v. State, 132 Tex. Cr. R. 130, 102 S. W. (2d) 428.

We have abiding confidence in the correctness, as also the fairness, of the Texas rule and we steadfastly adhere thereto. The Supreme Court of the United States does not accept the Texas rule but, if we correctly interpret its latest expressions, gives to the verdict of the jury only an "alert deference" in arriving at a conclusion after an examination of the facts.

Viewing the record as a whole, we are unable to bring ourselves to the conclusion that the confession was shown to be involuntary under either rule.

In consequence, we hold that:

(1) The confession was shown to be admissible in evidence under the laws of this State.

(2) The issue arising under the testimony as to the voluntariness of the confession was decided adversely to appellant's contention by the jury upon full and fair instructions from the trial court.

(3) The undisputed facts do not authorize the conclusion that the confession was involuntary, under the laws of Texas or the decisions of the Supreme Court of the United States.

Appellant's contention that the use in evidence of this con-

fession constituted a denial to him of due process as guaranteed by the Fourteenth Amendment to the Federal Constitution is overruled.

By motion to quash the special venire, appellant alleged that in the selection of the list of jurors from which the special venire was drawn he was denied the equal protection of the laws as guaranteed by the Fourteenth Amendment.

The question sought to be presented is not before us.

We do not know from this record who composed the jury that returned the verdict in this case—whether they were chosen from the special venire under attack, or otherwise; nor does this record reflect that appellant was a member of the class against which he alleges discrimination was practiced, nor any other fact which would authorize him to charge a denial of equal protection in the organization of the jury that returned the verdict against him. We are not authorized to supply these controlling facts by presumption. For one to claim a denial of equal protection, he must have been injured thereby.

Several bills of exception appear, complaining of argument of State's counsel. The argument so complained of violated no statutory, or mandatory rule. It was neither vicious, nor inflamatory, nor unwarranted upon the face thereof. No attendant facts or circumstances are set forth in the bills demonstrating the fact that argument was not legitimate.

As to the argument set forth in one of the bills, it is noticed that appellant—upon cross-examination—admitted that in 1943 he had been indicted for the felony offense of assault with intent to rape. Proof of such fact was admissible as touching the credibility of the appellant as a witness. According to the bill of exception, the jury's consideration thereof was limited to that purpose by the trial court. Counsel for the State was therefore authorized to argue such fact to the jury for the purpose mentioned. Clark v. State, 161 S. W. (2d) 1072.

The other bills of exception appearing in the record have been examined and are overruled without discussion.

The judgment is affirmed.

The foregoing opinion of the Commission of Appeals has

been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

## ON MOTION FOR REHEARING.

GRAVES, Judge.

Appellant takes us to task relative to the original opinion in this case wherein it was said, in substance, that the record does not disclose who composed the jury in this case, whether from the special venire or otherwise. It is well known that in the event of an exhaustion of a presented venire the court has the power, under the law, to order the sheriff to summon talesmen, who, of course, would not be members of such special venire as chosen by the jury commissioners. What was meant by such statement is that the record does not show who were on the jury that tried appellant, nor whether they were members of such original venire or not. It is shown that the jury commissioners selected a grand jury venire composed of sixteen persons, two of whom were negroes; that they had present in their deliberations the poll tax list, doubtless in order to comply with the statute, Art. 339, para. 1, C.C.P., which relates to the payment of a poll tax; they also had with them the property tax payers list, as well as the list of jurors selected the previous term, as well as a subsequent term of court as provided by law, and also a list of the members of the Home Guard and also a list of the active firemen, all exempt by law. It is also shown that they actually did select some fifteen or eighteen negroes on these jury lists. Appellant's main contention herein is that the proportion of colored citizens to white citizens in Polk County being from ten to fifteen per cent colored, that a fair percentage of negroes on such juries would have been much more than the fifteen or eighteen that were selected.

It is not shown how many of these negroes actually selected did appear, nor whether any such sat on this case or not. It is shown that many of the negroes in such county were not qualified jurors, unable to read or write, or having other matters present that would disqualify them from jury service. We do not think it has ever been held that it was necessary, nor even practical, to say that jury services should be divided between the white and colored races in a close proportion to either the percentage such populations bear to each other, or to the percentage of qualified jurors each bear to the other. It is contended that because the jury commissioners utilized the property tax payers' list, among other lists, in selecting the jury venire for this case, that such utilization resulted in itself as a discrimina-

tion against appellant because of his color. As we are herein criticised for saying in our original opinion, we repeat: Nowhere is it shown that the jury that tried this appellant was composed of men whose identity corresponds with that of the jurors presented by such commissioners, and, therefore, under the statutes of this State relative to the formation of juries, we do not know whether this jury was composed of negroes or whites, all negro or white persons, so far as is shown in this record.

In appellant's motion to quash the special venire, based mainly on the fact that it was therein claimed that the jury commissioners acted unlawfully because they utilized the list of property tax payers, there is an assertion made in paragraph 6 thereof that the district judge, in impaneling such jury commission, instructed the commissioners relative to drawing a certain number of negroes for each week. The testimony heard on such motion does not bear out that statement. It does show that the court merely told them to make no distinction between white and colored persons in drawing their lists. It is here noted that the record is silent relative to any bill of exceptions to the refusal of the trial court to quash the special venire herein complained of. See 4 Tex. Jur., p. 209.

Reverting to the confession made by appellant in our original opinion, same is discussed at length, and it is there said that no objection nor exception was shown thereto at its introduction. We have searched the record again and find no bill of exceptions present therein to such statement. In order to preserve such matter for our attention, it has always been held that an objection and an exception to the ruling of the court should have been taken and be found in the record. See 4 Tex. Jur., 208, Sec. 148. Appellant's motion for a rehearing has certain objections offered by his attorneys to the introduction of this statement, but nowhere is same set forth in a bill, and it was stated therein that appellant's attorneys did not prepare a special bill relative to the court overruling his objections thereto. Under our procedure we have no right to consider matters not brought to our attention properly; however in an excess of caution and on account of the verdict exacting the death penalty, the matter has been considered by this court.

That there can be no question of this man's guilt, we take it, can surely be conceded; that with our mixed populations and varied matters that surround our communities and that arise in the enforcement of the law, none want to pay the penalty laid down for a criminal act; that at times this matter of an enforce-

ment of the law becomes difficult and depends upon the ability of a peace officer to unravel that which seems to be a mystery in its inception. That these diligent peace officers, men in whom their community and their State had reposed their confidence, acted within the bounds of reason and fairness with this appellant, seems true to those who have carefully gone over this record more than once. The jurors saw the witnesses; they observed their demeanor while on the stand; they heard their voice, and are in a much better position to know where the truth could be found than are we, who only have the written word to judge of the verity of the statements given in testimony. Appellant's own testimony, his actions and demeanor, doubtless convinced this jury, as well as the testimony of the officers, that he received no harsh treatment at the hands of the two officers whom he claimed had beaten him.

Under our rules of procedure as well as the law, we think this cause evidences no error that should call for a reversal. The original opinion was carefully written after much research and study, and to that we now adhere.

The motion will therefore be overruled.