ALBERT GRAHAM ANGEL V. THE STATE.

No. 23514. Delivered January 29, 1947.
Rehearing Denied March 19, 1947.

*Martin, Moore & Brewster,* of Fort Worth, for appellant.

*Alfred M. Clyde,* Criminal District Attorney, *J. Elwood Winters,* *W. R. Parker* (deceased), and *W. E. Myers,* Assistant Criminal District Attorneys, all of Fort Worth, and *Ernest S. Gones,* State's Attorney, of Austin, for the State.

GRAVES, Judge.

Appellant was charged with the murder of Luther L. Hankins, and upon his trial therefor was assessed the penalty of death.

Appellant, a man 39 years old, lived at a rooming house or hotel belonging to the deceased known as No. 1209 1/2 Chambers Street, in Fort Worth, Texas.

It was alleged in the indictment that appellant, on July 11, 1945, killed Mr. Hankins by strangling him with a wire wrapped around the neck, and by striking, beating and wounding him with a hammer.

On July 11, 1945, in the late afternoon, it is shown that Luther L. Hankins, who was 59 years of age and practically blind, together with appellant, entered appellant's automobile and left the rooming house for an unknown destination. This was the last time Mr. Hankins was seen alive. Appellant's father lived near the Fort Worth-Mansfield public road, where appellant was raised, and near an abandoned farm called the Mathis farm in Tarrant County. The morning after Hankins disappeared in company with appellant, he (appellant) appeared at this rooming house in possession of the keys thereto, and announced that he had purchased such place from Hankins and that "he won't be back." The following day (July 13, 1945), two days after Hankins had disappeared, appellant's father came to J. T. Beasley, a Justice of the Peace of the Mansfield

Precinct, and had a conversation with Mr. Beasley, who thereafter in company with appellant's father went to a smokehouse on this abandoned Mathis farm, which was about a quarter of a mile from the farm of appellant's father, and there Mr. Beasley found the dead body of a man, afterwards identified as that of Luther L. Hankins. This body had a wire wound about the neck and evidenced a hole on the forehead over the right eye, as well as other wounds about the head. The trousers were gone from the body, and no hat was near it. The legs bore scratches as though they had been dragged on the ground.

Doctor Andujar performed an autopsy on this body. He testified to an eight-inch cut on the head, about an inch and a half in diameter; a similar wound on the left side of the head; a third wound in the hair line; the right cheek bone was bruised around the base of the neck; and a further wound a half inch in thickness. The neck wound could have been caused by the wire found thereon. The skull bone was mashed inward into the brain, and there was bleeding therefrom which evidenced that the injured person lived after the strokes on the head. The cut on the forehead, however, was not accompanied by any blood, and was evidently made after death. The lungs bore unmistakable evidence that death was caused by strangulation.

The officers began an immediate search for appellant after they had established the identity of the body by fingerprints; and about 1:30 o'clock in the morning of July 13, 1945, they took appellant into custody. They began to question him, and after an hour or so Sheriff Rhodes, who was questioning him, went home, and some of his deputies continued such questioning. About 8:00 o'clock of that morning the officers ceased questioning him and placed him in a hold-over cell, where he was given his breakfast. However, there was no chair or table therein. After the officers had finished their breakfast, some of them returned and appellant was taken from the hold-over into the sheriff's office and again questioned. One Prater, a deputy sheriff, not engaged in this questioning, was a cousin of appellant, and at one point in this questioning Mr. Prater appeared, either at the request of appellant or the suggestion of the officers, and told appellant that he (Prater) thought it would be best to tell the truth about the matter at inquiry. About the time of making a statement in writing, appellant had told the officers that he had taken the deceased's trousers, and hat and appellant's hammer, and given them to his father to hide or burn them. About 1:30 o'clock on the 13th day of July, Mr. Parker, an Assistant District Attorney, was called to the

sheriff's office, and told that appellant desired to make a statement, whereupon he talked to appellant, and being informed of such fact, he gave appellant the statutory warning. He then took him to an office of the District Attorney, and procuring a stenographer, he again gave him the statutory warning, whereupon appellant made certain statements to him which he in turn dictated to the stenographer and which were transcribed by her and to which appellant appended his signature. This statement, when offered in evidence, was objected to as having been obtained in violation of the State Constitution as well as the "due process clause" of the Federal Constitution. It is worthy of notice also that from what appellant had told the officers as to the location of the trousers and hat of the deceased, they found portions of the trousers where they had been partially burned, and the father of appellant took them to where he had buried the deceased's hat, and same was taken from a hole in the ground.

The facts relative to such written statement come entirely from the officers questioning appellant. They began looking for him soon after they established the identity of the deceased's body and found him about 1:30 in the morning of July 13th, and soon thereafter began to question him. This they had a right to do.

The Supreme Court of the United States, in the case of Lyons v. Oklahoma, 88 L. Ed. 1481, 322 U. S. 596, 64 S. Ct. 1208, declared as follows:

"The mere questioning of a suspect while in the custody of police officers is not prohibited as a matter of common law or due process. Lisenba v. California, 314 U. S. 219, 239-241, 85 L. Ed. 166, 181, 182, 62 S. Ct. 280; Ziang Sung Wan v. United States, 266 U. S. 1, 14, 69 L. Ed. 131, 148, 45 S. Ct. 1."

In the instant case, appellant did not take the witness stand, and he made no complaint relative to any mistreatment during the twelve hours of his questioning. True, it is shown that he had no sleep during these twelve hours, and neither did these diligent officers who were endeavoring to find out the facts relative to this offense. The testimony relative to the conversation with the cousin, Prater, is not thought to evidence sufficient force to have caused him to make an involuntary statement, or to overcome his will to such an extent that he would lose his ability to resist a natural inclination to shield himself by not disclosing his participation in this crime.

The confession, while implicating appellant in the killing of Mr. Hankins, also contains one of his presented defenses in the following paragraph offered by appellant:

"After Hankins and I got to the place where he was killed, and before he fell out of my car, he tried to stick me with a dirk knife. The blade of this knife was 6 or 8 inches long. He brought this dirk knife with him from his house. He never did get to cut me with this knife. I knocked this knife out of his hand and threw it from where we then were, and so far as I know it is still out there."

We think under the proven facts herein, it is shown that this statement was the free and voluntary act of appellant, made after a proper warning, and was admissible as such under Art. 727, C. C. P. We further express the opinion that the statement itself would become admissible because therein statements are made of facts shown to be true which conduced to establish guilt, such as the finding of the trousers of the deceased and his hat, both of which he stated that his father had been given and told to make disposition thereof. We further observe that appellant's guilt is not made to depend alone upon his signed statement. There was damaging testimony given by his half-sister, a school-girl 12 years old, who testified in substance that appellant appeared at his father's house in the afternoon and in an excited manner gave the father a hammer and told him to bury it; that later on he gave his father some pants which he said were those of the man he killed and told him to burn them; that he told the father that he had killed Luther Hankins; that there was blood on her brothere's shirt; that there was also blood all over the brother's car, and all over the seat; that when the brother left after bringing the hammer to the father, he said he was going back to the Mathis place to finish the man he had killed; that if he didn't get Hankins, that dope ring would get appellant; that the father took the hammer and hid it, and then burned the pants.

We think it is obvious that the State did not wholly rely upon the written statement in order to fasten the guilt upon appellant. We think the further fact that upon the paragraph of appellant's statement herein quoted there exists the basis of his claimed self-defense, without which, upon his failure to take the stand, his sole defense, save that of insanity, would depend upon the testimony of his half-sister wherein she said he told his father that, "he said that he had killed a man." We think the statement was admissible, not only under our state

decisions, which are numerous, but also under the decisions of the Supreme Court of the United States. See Ashcraft v. Tennesesee, 88 L. Ed. 1192, 322 U. S. 143-174; and for a comprehensive discussion by this court, see Newman v. State, 187 S. W. (2d) 559. Under the instructions with which the careful trial court guarded the admission of this statement, we think no error is shown herein.

This cause went to trial upon the 6th day of November, 1945, and was concluded on November 10, 1945, with a verdict of guilt and a sentence of death.

Aside from the defense of insanity, the only defense offered by appellant was the sole paragraph in his written statement and the statement by his half-sister, that "he said that he had to kill a man," as well as her further statement that "down there that afternoon after I had heard Graham (appellant) calling for my father, and when we folks went on down there, I heard Graham tell my father that he had to kill Hankins, because Hankins had drawn a dirk knife on him, and that Hankins was trying to kill him." To the same effect was a statement testified to by Sheriff Rhodes on the motion for a new trial, the sheriff being sick at the time of the trial. It will be noted that in appellant's statement he had stated that the deceased had drawn a knife on him, and he had taken the knife away from deceased and thrown it away. It is shown that after the making of this statement, appellant had gone to the scene of this homicide in company with the officers on July 13th, two days after the killing, and had endeavored to show them where he had thrown the knife, but after a close search therefor, no knife was found. It is shown, however, that at this abandoned farm the weeds and grass were growing profusely. Again, it was shown on the hearing of the motion for a new trial that further search was made at this scene, and no knife was found. However, after this trial was concluded, and before the hearing of the motion for a new trial, appellant's attorneys had hired the Burns Detective Agency to endeavor to find such knife and one, Denver Seale, working for such agency, on the second day of his quest, (December 2, 1945), found at this scene a dirk knife with a blade of about six inches long and a metal handle, and scratched thereon the initials "L. L. H." There was a controversy relative to the presence of such knife at the time it was searched for by the officers, not only when appellant was present but at different times on the initiative of appellant's attorneys, as well as on the part of the peace officers. In each instance, the ground surrounding this

killing seemed to have been thoroughly gone over and every portion thereof had been carefully scrutinized, but no knife was found. However, in the latter part of November, the weeds and grass had been subjected to killing frosts, and on December 2nd, after the trial was concluded on November 10th, a knife was found at a point near the scene of the killing. This knife, here present in the record, evidently bears the initials "L. L. H.", and was identified by a witness as the property of the deceased Had the knife been available and present at the trial of appellant, it would certainly have been admissible and might have had some weight with the jury as corroborative of appellant's statement relative to his plea of self-defense, subject, of course, to the testimony of the State relative to its presence, or lack thereof, at the time of this trial.

While the finding of this knife may be called corroborative of appellant's offered defense, and if such alone, same would not come within the rule of newly discovered evidence under our rulings. See Gray v. State, 144 S. W. 284, 65 Tex. Cr. R. 204, and many cases there cited. However, the testimony relative thereto has a tendency to establish the transaction itself, and becomes available testimony unable to be produced at the trial, and is the only independent support of appellant's factual defense, all of which originally came from him. See Clark v. State, 51 Tex. Cr. R. 519, 102 S. W. 1136; Henson v. State, 168 S. W. 89, 74 Tex. Cr. R. 277.

Appellant had two defenses, one relating to insanity and the other being that of self-defense. The insanity plea was supported by the testimony of some medical men, the burden of their testimony being that appellant had the mentality of a 11-year-old child, some of them going far enough to say that he did not know the right and wrong of the charged act, nor the probable consequences thereof, while other testimony merely showed a retarded mentality and knowledge of the consequences of his act. Be that as it may, the jury were justified, we think, in their verdict finding him of sound mind at the time of the homicide, as well as at the time of the trial.

There were then left only the statements of his half-sister as to what appellant told his father, coupled with the above-quoted portion of the written statement of appellant introduced by his attorneys. We think the finding of a knife at the scene of the killing might have had some weight with the jury in considering appellant's plea of self-defense. It certainly could not

have militated against his interest but might have helped him. It can be said that the fact that the absence of this belated piece of evidence, not available at the time of the trial, was at least not corroborative of the plea of self-defense, but to the contrary, could have been used by the jury in discarding the only testimony in appellant's favor, especially so in view of the fact that appellant did not testify herein.

We think that this testimony of the finding of the knife, now available, should go before a jury with the circumstances surrounding the finding of the same before appellant should suffer the extreme penalty of the law.

We find many bills of exception in the record, some of them being concerned with the argument of counsel for the State. We feel sure that such matters complained of in such bills will doubtless not occur upon another trial, and we do not write upon same.

What we have said herein is not intended in any sense as a criticism of the learned judge and faithful officers who tried this case; nevertheless, we think this testimony to be vital to appellant's defense and should be presented to a jury before appellant should pay a penalty for taking the life of the unfortunate Mr. Hankins.

From what we have said, it follows that because of the newly discovered and made available testimony, this judgment will be reversed and the cause remanded.

### ON STATE'S MOTION FOR REHEARING.

HAWKINS, Presiding Judge.

The State insists that this court was in error in reversing this cause on the ground of newly discovered evidence. Because of the unusual manner in which the question came into the case it was given close scrutiny upon original submission. Nothing can be added to our reasons appearing in the original opinion.

Believing the case has been properly disposed of, the State's motion for rehearing is overruled.