Charlie Lee FOSTER, Jr., Appellant,

v.

The STATE of Texas, Appellee.

No. 39160.

Court of Criminal Appeals of Texas.

March 23, 1966.

for life, began on July 6, 1965 and judgment having been rendered on the jury's verdict and sentence pronounced, notice of appeal was given on August 4, 1965.

The offense for which appellant was tried and convicted was alleged and shown to have been committed on or about the 25th day of March, 1963, at which time the appellant was under 16 years of age.

The statement of facts reveals that the body of M. J. Tremont, the deceased, who had been reported missing, was found shortly after 9 A.M. on March 26, 1963, in a pasture just off of Wilcox Lane, in Brazos County, about 8 miles from Bryan. There was a cedar post lying across his body.

Appellant came to the Brazos County Jail about 7:10 o'clock the next morning and told Deputy Sheriff Fronterhouse that he was the one that had killed Mr. Tremont.

Sheriff Hamilton had visited the scene and had seen the body and a hat and other articles in the immediate area and had taken charge of the fence post. In response to Deputy Fronterhouse's call, he went to his office and talked to appellant who confessed to him that he killed Mr. Tremont.

Appellant's version of the facts and circumstances surrounding the killing is shown in the following testimony of Sheriff Hamilton:

Elmer McVey, William S. Thornton, Bryan, for appellant.

D. Brooks Cofer, Jr., County Atty., William R. Vance, Asst. County Atty., Bryan, and Leon B. Douglas, State's Atty., Austin, for the State.

WOODLEY, Judge.

The indictment charging appellant with the murder of Marion John Tremont was returned on March 25, 1965, at which time appellant was seventeen years of age.

The trial which resulted in the conviction of the appellant, with punishment assessed at confinement in the penitentiary

"Q. What was the first thing that he told you, as best you recall?

"A. Well, he admitted to me this crime, this killing. He told me where Mr. Tremont had picked him up.

"Q. And where was that, sir?

"A. On 23rd and Sims, in Bryan. He then told me that where this happened was on out in the country, and he directed me every turn to the scene of this killing.

*    *    *    *    *    *

"Q. And what did he say happened there at Wilcox Lane where the body was discovered?

"A. He said they parked the car there, I believe he said they crawled over the gate, and went down to the edge of the woods, and he went on ahead, or got behind Mr. Tremont, one way or the other, and as he came by he fired at him with this pistol.

*    *    *    *    *    *

"Q. Now, Mr. Hamilton, did he tell you how he killed Mr. Tremont?

"A. He did.

"Q. Will you tell the jury what he told you?

"A. Yes, sir. He said after he had shot at him several times with the pistol, the pistol, he didn't think would shoot him, and Mr. Tremont had started running back toward the car, and he caught him just before he got to the fence where there is a gate there near, and picked up a cedar post and hit him with it. He said he remembered that he hit him two or three times. He said he might have hit him more, but he did remember hitting him 2 or 3 times, and then he straightened the body out and left.

"Q. Did he tell you what time of day that was?

"A. He said it was shortly after he picked him up.

"Q. And did he tell you he took Mr. Tremont's car keys?

"A. Yes, sir.

"Q. And did he tell you that he drove Mr. Tremont's car back to town?

"A. Yes, sir.

"Q. All right, did he tell you how he came back to town?

"A. Yes.

"Q. Tell the jury whether or not he told you he stopped at Nuche's Store, or a store on the way back?

"A. He told me he did and that he made a purchase there.

*    *    *    *    *    *

"Q. Did he tell you he made any purchases at any store downtown?

"A. He said he did at the Guarantee Store.

"Q. Did he tell you what money he used to make these purchases?

"A. He did. He told me he had taken Thirty Dollars off of Mr. Tremont's body, and that he had used part of this money to make these purchases with it.

*    *    *    *    *    *

"Q. After he made the purchases at the Guarantee Store did he tell you whether or not he drove around town in Mr. Tremont's car?

"A. Yes, sir, and he mentioned the fact that some boy hollered at him, and called this boy by name.

"Q. And did he tell you then what happened?

"A. Yes, sir, he said that he drove the car behind the compress there, and he hit a tree with it."

On cross-examination, Sheriff Hamilton testified:

"Q. In the statement that the boy made to you, did he tell you the reason that he carried Mr. Tremont down to the pasture,—or the reason that Mr. Tremont had asked him to carry him down there?

"A. Yes, sir.

"Q. And what was that statement?

"A. He said he had talked to him about some girls.

"Q. And had he talked to him on several occasions about that same subject matter?

"A. He told me that when he approached Mr. Tremont he said, 'Do you remember me? I'm the one that you were talking with about some girls a year or so ago,' and that is the way that—it was just one other time that was mentioned by Charlie Lee."

The Sheriff further testified that he found the pistol where appellant said he had thrown it, and found a billfold containing M. J. Tremont's driver's license and other cards bearing his name and address as a result of what appellant told him.

Dr. Joseph Jachimczyk, who conducted the autopsy, described two distinct blunt lacerations over the left temporal and parietal areas of the scalp of the deceased and a broken neck, either of which, he testified, could have caused his death. He further testified that the cedar post could have caused such injuries.

Testifying in his own behalf, appellant admitted being present when Mr. Tremont was attacked and admitted that he confessed to killing him, but testified that the deceased told him that he had to get him a girl and he told him no; after he went into the pasture, as the deceased told him to, the deceased came over there and hit him on the arm; that he pulled out the pistol which was loaded with blank cartridges and fired it about five times. Then a truck drove up and a man came over the gate, picked up the cedar post and began beating Mr. Tremont. After he got through beating him, the stranger got Mr. Tremont's car keys and billfold and handed them to him (appellant) and told him to get in the car and go back to town and tell that he (appellant) did it or he would get him or

kill his mother and daddy, and he did so through fear.

The jury rejected appellant's explanation of the killing and the evidence is sufficient to sustain their verdict.

The trial court did not err in admitting appellant's oral confession which led to the finding of the pistol, the billfold and its contents.

The fact that appellant was without counsel when he came to the Deputy Sheriff and confessed to him and to the Sheriff did not render his voluntary statement inadmissible. The portion of such confession made after his arrest was admissible under the portion of Art. 727 C.C.P. excepting from its provisions confessions in connection with which the defendant makes statements of facts or circumstances that are found to be true, which conduce to establish his guilt. Riddle v. State, 150 Tex.Cr.R. 419, 201 S.W.2d 829; Angel v. State, 150 Tex.Cr.R. 183, 200 S.W.2d 169; Gage v. State, 159 Tex.Cr.R. 336, 263 S.W. 2d 553.

Appellant's next complaint relates to the following incident which occurred during the cross-examination of Sheriff Hamilton when he was asked: "Q. Did he tell you about Mr. Tremont bothering him about wanting him to get a colored girl to take her down there for sexual relations, did he tell you that?"

The statement of facts reflects:

"At this point in the proceedings the widow of the deceased, who was present as a spectator in the Courtroom, rose from her seat, and in a loud voice said: 'That's a lie. That's a lie. He was trying to protect his skin when he said that God damn liar.' The Court rapped for order, and asked Mrs. Tremont's son-in-law, who accompanied her, if he could control the situation. He assured the Court he could, and escorted Mrs. Tremont, who was subdued by this time, out of the Courtroom."

The cross-examination then continued to its conclusion, at which time the trial judge instructed the jury to disregard the comments and statements of the wife of the deceased, and court was recessed for the day. The following day in the court's chambers appellant's counsel moved for mistrial because of the incident.

■ Assuming that the complaint is properly before us, the court's failure to grant the belated motion for mistrial was not reversible error.

The record reveals that on March 27, 1963, after Mr. Tremont was killed, petition was filed in the Juvenile Court alleging that appellant was a delinquent child under the law having "committed theft from a person," and on April 1, 1963, he was found to be a delinquent child and committed to the care, custody and control of The Texas Youth Council in accordance with the provisions of Art. 5143d Vernon's Ann.Civ.St. He was confined in the Mountain View School at Gatesville, an agency of The Texas Youth Council, until after he was indicted for murder when a bench warrant was issued and he was returned to Bryan.

Appellant contended in his motion for new trial that he was denied due process of law in that the state waited a period of two years before charging him and bringing him to trial.

Point 3 of appellant's original brief reads in part:

"The Texas Constitution, under Art. 1, & 10, grants to an accused 'a speedy' public trial. This wording has been passed on many times when the question has been raised concerning what the term 'speedy' means. It is settled that it means no undue delay. Wood v. State, Tex.Cr.App. [171 Tex.Cr.R. 307], 349 S.W.2d 605; Elliott v. State, Tex.Cr.App. [168 Tex.Cr.R. 140], 324 S.W.2d 218; and others. It has been determined that a two month delay is permissible when the offense was committed two months before the de-

fendant reached his 17th birthday. Watson v. State, 90 Tex.Cr.R. 576, 237 S.W. 298.

"However, in the case at hand, the offense was committed when the Defendant was only 15 years and 3 months old. At that time, he was adjudged a juvenile delinquent and committed to Gatesville. After his 17th birthday, almost two years later, he was indicted for murder, and on July 6, 1965, was brought to trial and assessed a life sentence.

"In Hultin v. State, 171 Tex.Cr.R. 425, 435, 351 S.W.2d 248, Judge W. T. McDonald, in recognizing that an injustice could arise under the law as it stands states 'that the power to prevent such occurrence is a legislative and not a judicial function.'

"It is Appellant's contention that the delay involved in this case violates his Constitutional guarantee of a speedy trial, that the Constitution is the ultimate record of the Legislature, and anything to the contrary is unconstitutional and therefore of no force and effect.

"As recognized by the Court in the Hultin case, there must be a limit somewhere. It is Appellant's position that this limit has been reached under these circumstances.

"The record in this case affirmatively shows that this defendant did not receive a fair trial and was denied due process of law, and to permit the verdict and judgment in this case to stand would be a great injustice to him."

■ The decisions of this Court, including those cited by appellant, construing the statutes in effect at the time appellant was indicted, tried, convicted and gave notice of appeal, are to the effect that it was not error to wait until a child is 17 years of age to prosecute him as an adult for a murder committed when he was under 15

years of age. The age of the defendant at the time of the trial and not at the time of the offense controls. Roberts v. State, 153 Tex.Cr.R. 308, 219 S.W.2d 1016; Wood v. State, 171 Tex.Cr.R. 309, 349 S.W.2d 605; Perry v. State, 171 Tex.Cr.R. 282, 350 S.W. 2d 21; Martinez v. State, 171 Tex.Cr.R. 443, 350 S.W.2d 929; Hultin v. State, 171 Tex.Cr.R. 425, 351 S.W.2d 248; Lopez v. State, 171 Tex.Cr.R. 552, 352 S.W.2d 106.

House Bill 444, enacted at the last legislature, amending certain sections of Art. 2338–1 V.C.S. (Acts 59th Leg.1965, p. 1256, Ch. 577) was approved June 17, 1965. It did not become effective until August 30, 1965, hence was not in effect at the time this case was tried and decided in the trial court.

The provisions added to Art. 2338–1 which concerned us to such extent that the case was re-submitted and re-argued are those which might be construed as barring the trial of any defendant as an adult under any conditions upon a showing that such defendant was under 16 years of age at the time the offense was committed. If this be so, the decisions of this Court in the cases above cited, as to such a defendant under 16 years of age at the time he committed the offense, have been overruled and neither this nor any future conviction of such a defendant without regard to his age at the time of his trial as an adult can stand.

One portion of Section 6 of Article 2338–1 as amended by House Bill 444, Acts 59th Legislature 1965, p. 1256, Ch. 577, provides for the certification of a child 16 years of age or older by the Juvenile Court for criminal proceedings with the provision that no child under 16 years of age at the time the offense is committed shall be so certified.

The Caption of the Act gave notice that it was "providing for transfers of certain cases in Juvenile Courts from the jurisdiction of Juvenile Courts to the jurisdiction of the other courts in this State" and was "providing that certain delinquent children shall be subject to the penal laws and criminal prosecution the same as if they were adults."

The above portion of amended Section 6 conforms to the purpose and intent of the Legislature as expressed in the emergency clause: "The fact that the present law is inadequate to curb juvenile delinquency in this State creates an emergency * * *."

We find it difficult to understand the further provisions of Section 6 as amended which reads:

"[A]nd no child under sixteen (16) years of age at the time the offense is committed shall be prosecuted as an adult at any later date *unless transferred by the Juvenile Court,* and all such offenses committed by children *not so transferred* shall be subject to disposition by the Juvenile Court only."

If, under the rules of statutory construction, there is any way to construe these provisions so as to conform to the notice in the Caption, and to the purpose and intent of the Legislature as indicated by the Caption and the emergency clause, and leave a statute that is not contradictory, vague and uncertain, we have been unable to find it.

The Caption gave notice to the Legislature and the public that House Bill 444 would provide that certain delinquent children *shall be* subject to the penal laws and criminal prosecution the same as if they were adults, but no notice that the act would provide that male defendants over 17 and females over 18 years of age would no longer be subject to but would be exempt from such penal laws and criminal prosecution if they were under 16 years of age at the time they committed the crime.

■ That portion of the amendment of Section 6 of Art. 2338–1 which provides "no child under sixteen (16) years of age at the time the offense was committed shall be prosecuted as an adult at any later date

unless transferred by the Juvenile Court, and all such offenses committed by children not so transferred shall be subject to disposition by the Juvenile Court only," is so indefinitely framed and of such doubtful construction that it cannot be understood, either from the language in which it is expressed or from some other written law of the state, and must be regarded as wholly inoperative. Art. 6 P.C.; Ex parte Marshall, 72 Tex.Cr.R. 83, 161 S.W. 112.

■ Under the holding of this Court in Ex parte Meyer, 172 Tex.Cr.R. 403, 357 S.W.2d 754, and cases cited, such portion of the statute is likewise invalid because the Caption of the Act is misleading and fails to give notice that persons under 16 years of age at the time the offense was committed were to be exempted from penal laws and criminal prosecution.

■ Having decided that the prosecution of the appellant as an adult for the murder of M. J. Tremont is not barred by reason of House Bill 444, we next consider whether such prosecution is barred by reason of appellant's having been placed and held in custody as a juvenile delinquent pursuant to his commitment by the Juvenile Court upon a finding that he was a delinquent child in that he "committed theft from a person."

No contention has been advanced by appellant's counsel that appellant's prosecution as an adult is barred by reason of his commitment and custody in the Juvenile Court proceedings. In fact counsel for appellant argue that the items found as a result of appellant's oral confession "may have connected him with the offense of 'theft from a person' (for) which Defendant was originally tried (in the Juvenile Court proceeding) but were in no wise involved in the murder."

The supplemental transcript filed in this Court after the case had been set for resubmission contains a certification by the trial judge:

" * * * that the defendant, then age 15, was committed to the Texas Youth Council on a charge of theft from the person under testimony admitted in the Juvenile Court, the evidence showing that $30.00 in cash and an automobile were taken from M. J. Tremont.

"The defendant remained at Gatesville under the control of the Texas Youth Council until shortly after he became 17 years of age when he was brought back by the order of this Judge to stand trial for the felony offense of murder with malice aforethought * * *.

"In this case and in Brazos County, Texas, the Judge of the 85th District Court and the Judge of the Juvenile Court are one and the same person, acting in both capacities.

* * * * * *

"The District Court of Brazos County never assumed any jurisdiction of the defendant until the defendant became 17 years of age, *and the Juvenile Court of Brazos County, Texas never assumed any jurisdiction whatsoever of the defendant upon any charge of* murder. If there was ever any charge of murder against the defendant prior to his reaching the age of 17 this Court was not aware of it, and such charge, if any, would have been against the express Orders of this Court, acting in both capacities."

The evidence adduced at the trial of the appellant for murder and the facts certified by the District Judge who presided in the Juvenile Court proceedings and also at the murder trial distinguish this case from Garza v. State, Tex.Cr.App., 369 S.W.2d 36, and account for the fact that appellant's able court appointed counsel have made no contention that he was deprived of due process under the 14th Amendment to the Constitution of the United States under the decision of this Court in Garza v. State, or under Sawyer v. Hauck, 245 F.Supp. 55,

wherein the United States District Court for the Western District of Texas, in a post conviction proceeding, set aside the holding of this Court in Ex parte Sawyer, 386 S.W.2d 275, and found that Sawyer was denied due process.

The judgment is affirmed.

MORRISON, Judge (dissenting).

This underprivileged colored boy has been denied due process of law, and the record in this case affirmatively asserts it. What I say should in no wise discredit the conscientious and considerate trial judge who tried this case. This boy was fifteen years and three months old when the offense for which he presently stands convicted was committed. He was committed to Gatesville under evidence admitted before the juvenile court showing that he had taken $30.00 in cash and an automobile from M. J. Tremont, and was there confined until he was seventeen. He was then returned to Bryan, tried again and given a life sentence for killing M. J. Tremont at the time he took the $30.00 and the automobile.

In Doggett v. State, 130 Tex.Cr.R. 208, 93 S.W.2d 399, (1936), this Court speaking through Presiding Judge Morrow in a well considered opinion said:

"In the present instance, the proof is conclusive that, in the appellant's conviction for murder, he was convicted of the same transaction and upon the same evidence as that upon which he was previously convicted of the offense of robbery with firearms."

The opinion of the majority is contrary to the rationale of this Court in Garza v. State, 369 S.W.2d 36, and the holding of the United States District Court for the Western District of Texas in Sawyer v. Hauck, 245 F.Supp. 55.

I dissent with vigor as I did in Ex parte Martinez, Tex.Cr.App., 386 S.W.2d 280, and Ex parte Sawyer, Tex.Cr.App., 386 S.W.2d 275.